# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched* <br> *or identify the person by name and address)* <br><br> 2940 Nau Avenue <br> Tustin, California 92782 | )<br>)<br>)<br>)<br>)<br>)    Case No.    8:18-MJ-00653 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Distribution of a Controlled Substance |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

<br><br>

_____
*Applicant's signature*

Lindsey Bellomy, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 12/18/2018 _____

_____
*Judge's signature*

City and state:   Santa Ana, CA     Honorable Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: B. Sagel x3598

## **AFFIDAVIT**

I, Lindsey Bellomy, being duly sworn, declare and state as follows:

## **I.  INTRODUCTION**

1.    I am a Special Agent ("SA") with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since December 2010.  I am currently assigned to the Los Angeles Field Division, Orange County Resident Office ("OCRO").  At OCRO, I am assigned to the Tactical Diversion Squad.  During my tenure with DEA, I have received comprehensive, formalized instruction on such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques.  I have participated in numerous investigations into the unlawful importation, manufacture, and distribution of controlled substances, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses.  In conducting these investigations, I have utilized a variety of investigative techniques and resources, including surveillance, confidential source debriefings, telephone toll analysis, and wire communications analysis.

2.   Through my investigations, my training and experience, and my conversations with other law enforcement personnel, I have become familiar with the tactics and methods used by traffickers to smuggle and safeguard pharmaceutical controlled substances, to distribute and divert pharmaceutical controlled substances, and to collect and launder the proceeds from the sale of controlled substances.  Further, I am aware of the tactics and methods employed by pharmaceutical trafficking organizations and individuals to thwart investigation of their illegal activities.

3.   Through my investigations, my training and experience, and my conversations with other law enforcement personnel, I and other law enforcement personnel have spoken on numerous occasions with pharmacists, physicians, DIs, Medical Board investigators, patients, and other witnesses having extensive knowledge of pharmaceuticals regarding the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this

matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II. PURPOSE OF AFFIDAVIT

5.    This affidavit is made in support of an application
for search warrant for the following location (the "**SUBJECT
PREMISE**") and to seize evidence, fruits, and instrumentalities
of violations of 21 U.S.C. § 841(a)(1) (Distribution of a
Controlled Substance), the "**target offense**":

a.    2940 Nau Avenue, Tustin, California 92782, the
residence of Dzung Ahn PHAM ("PHAM"), further described below
and in Attachment A.

6.    The **SUBJECT PREMISE** is more specifically described in
Attachment A to the search warrant application, which is
incorporated herein by reference.

7.    The requested search warrant seeks authorization to
seize items constituting the fruits, instrumentalities, and
evidence of the **target offense**.  The list of items to be seized
is set forth in Attachment B, which is incorporated herein by
reference.

## III. STATEMENT OF PROBABLE CAUSE

8.    On December 17, 2018, the Honorable Autumn D. Spaeth,
United States Magistrate Judge, signed a warrant to search 2940
Nau Avenue, Tustin, California, 92782, the residence of PHAM for
fruits, instrumentalities, and evidence of the **target offense**.
The government did not include the seizure of firearms in the

Attachment B.   A copy of the search warrant and accompanying affidavit is attached as exhibit 1 of this affidavit and is incorporated herein.

9.     On December 18, 2018, I along with other DEA Special Agents executed the search warrant at PHAM's residence and discovered numerous firearms and ammunition.  PHAM possessed at his residence approximately fifty-eight firearms, including approximately thirty-one long guns and twenty-seven handguns. Although impossible to know the full amount of ammunition without counting the rounds, it appears that PHAM possessed approximately 50,000 rounds of ammunition at his residence.

10.    I know based on my training, experience, and discussions with other law enforcement personnel, that persons involved in drug trafficking, including medical professionals, often have firearms to protect the proceeds of their drug trafficking.  I also know based on my training, experience, and discussions with other law enforcement personnel, that persons involved in drug trafficking, including medical professionals, often use the proceeds of their drug trafficking to purchase firearms both to protect other proceeds of their drug trafficking and as investments.

11.    Based on my training, experience, and discussions with other law enforcement personnel, I believe the firearms found at PHAM's residence are fruits, instrumentalities, and evidence of the **target offense.**

## IV. <u>CONCLUSION</u>

25.    For all the reasons described above, there is probable cause to believe that the **SUBJECT PREMISE** described in Attachment A contain the fruits, instrumentalities, and evidence of distributing controlled substances, and indicia of the proceeds from the sale of controlled substances, as described in Attachment B, constituting the fruits, instrumentalities, and evidence of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).

_____
Lindsey Bellomy
SPECIAL AGENT

Subscribed to and sworn before me
this _____ day of December, 2018.

_____
THE HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**SUBJECT PREMISE**: 2940 Nau Avenue, Tustin, California, 92782, the residence of Dzung PHAM, further described as a two-story, single family residence.  It is located on the north east corner of Nau and Maynard Avenues and is comprised of beige stucco, brown trim, and a brown tile roof.  The front door is brown in color and faces west toward Nau.  There is a concrete driveway that leads to two separate garage doors both of which are brown in color.  There is a concrete stepped walkway that leads to the front door.  The number "2940" is located approximately 6 feet off the ground just to the right of the single car garage door. The numbers are black in color with a white background.  Also, there is a black in color mailbox next to the driveway with the number "2940" on the front.



**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1), those violations involving Dzung Ahn PHAM, D.O., namely:

       a.   All firearms.

       b.   Documents that refer or relate to the purchase, acquisition and/or ownership of the firearms.

# Exhibit 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    8:18-MJ-00648 |
| | ) | |
| 2940 Nau Avenue | ) | |
| Tustin, California 92782 | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Distribution of a Controlled Substance |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Lindsey Bellomy, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     12/17/2018

_____
*Judge's signature*

City and state:  Santa Ana, CA

Honorable Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: B. Sagel x3598

## **AFFIDAVIT**

I, Lindsey Bellomy, being duly sworn, declare and state as follows:

### I. **INTRODUCTION**

1.    I am a Special Agent ("SA") with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since December 2010. I am currently assigned to the Los Angeles Field Division, Orange County Resident Office ("OCRO"). At OCRO, I am assigned to the Tactical Diversion Squad. During my tenure with DEA, I have received comprehensive, formalized instruction on such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques. I have participated in numerous investigations into the unlawful importation, manufacture, and distribution of controlled substances, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including surveillance, confidential source debriefings, telephone toll analysis, and wire communications analysis.

2.    Through my investigations, my training and experience, and my conversations with other law enforcement personnel, I have become familiar with the tactics and methods used by traffickers to smuggle and safeguard pharmaceutical controlled substances, to distribute and divert pharmaceutical controlled substances, and to collect and launder the proceeds from the sale of controlled substances.  Further, I am aware of the tactics and methods employed by pharmaceutical trafficking organizations and individuals to thwart investigation of their illegal activities.

3.    Through my investigations, my training and experience, and my conversations with other law enforcement personnel, I and other law enforcement personnel have spoken on numerous occasions with pharmacists, physicians, DIs, Medical Board investigators, patients, and other witnesses having extensive knowledge of pharmaceuticals regarding the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this

matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. PURPOSE OF AFFIDAVIT

5.    This affidavit is made in support of an application for search warrants for the following locations (collectively, the "**SUBJECT PREMISES**") and to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance), the "**target offense**":

a.    **SUBJECT PREMISES 1:** 15435 Jeffrey Road, Unit 127, Irvine, California 92618, the business office of Dzung Ahn PHAM ("PHAM"), further described below and in Attachment A-1.

b.    **SUBJECT PREMISES 2:** 2940 Nau Avenue, Tustin, California 92782, the residence of PHAM, further described below and in Attachment A-2.

c.    **SUBJECT PREMISES 3:** 141 Port, Irvine, California 92618, the residence of Erica R. GARCIA ("GARCIA") and E.S., further described below and in Attachment A-3.

d.    **SUBJECT VEHICLE 1:**  A 2004 Lexus sport utility vehicle, silver in color, bearing California license plate 5FJF828, with a listed registered owner of Dzung A PHAM at 2940 Nau, Tustin Ranch, California, and believed to be driven by PHAM further described below and in Attachment A-4.

e.    **SUBJECT VEHICLE 2:**  A 2015 Jeep Cherokee sport utility vehicle, white in color, bearing California license plate 7MOK843, with a listed registered owner of G.Z. on

Imperial Highway, Norwalk, California, and believed to be driven
by GARCIA, further described below and in Attachment A-5.

6.    The **SUBJECT PREMISES** are more specifically described
in Attachments A-1 through A-5 to the search warrant
application, which are incorporated herein by reference.

7.    The requested search warrants seek authorization to
seize items constituting the fruits, instrumentalities, and
evidence of the **target offense**.  The list of items to be seized
is set forth in Attachment B, which is incorporated herein by
reference.

A.    **Summary of affidavit**

8.    Dzung Ahn PHAM, D.O. ("PHAM"), is a licensed medical
doctor with an office located at 15435 Jeffrey Road, Unit 127,
Irvine, California, **SUBJECT PREMISES 1**.  PHAM sees "patients" at
this location on Monday, Tuesday, Thursday, Friday, and
Saturday.

9.    Based on, among other things, information obtained
from interviews, a review of PHAM's prescribing history, an
undercover investigation, and a medical expert's review of the
investigation, there is probable cause to believe that PHAM is
distributing controlled substances outside the usual course of
professional practice and without a legitimate medical purpose,
laundering the proceeds of his distribution of controlled
substances, and is committing the **target offense**.  As a result,
highly addictive and dangerous controlled substances, including
oxycodone, hydrocodone, amphetamines, and alprazolam, among
others, have been diverted from legitimate medical use into the

community for illegitimate use. Furthermore, PHAM is distributing the controlled substances to "patients" and there is probable cause to believe that some of these "patients," including GARCIA and E.S., are diverting the drugs and distributing the controlled substances illegally.

**B.   Targets of the investigation**

10. **Dzung Ahn PHAM, D.O.**: As is described in further detail below, evidence shows that PHAM is selling, primarily for cash, prescriptions for controlled substances to individuals, which prescriptions are outside the usual course of professional practice and without a legitimate medical purpose.

a.   PHAM is registered with DEA at Irvine Village Urgent Care, 15435 Jeffrey Road #127, Irvine, California, **SUBJECT PREMISES 1**, and has a current DEA registration number: BP3274254. A DEA registration number is required for ordering, storing, administering, and/or dispensing controlled substances.

b.   PHAM is also a detoxification doctor, *i.e.*, a doctor authorized with a waiver under the provisions of the Drug Addiction Treatment Act of 2000 to prescribe controlled substances to patients for addiction/dependence treatment (a "DATA waived physician"). PHAM is registered with DEA as a DATA waived physician at Irvine Village Urgent Care, 15435 Jeffrey Road #127, Irvine, California, **SUBJECT PREMISES 1**, under DEA # XP3274254.

i.   DATA waived physicians may treat narcotic dependence with Schedule III, IV, and V narcotic controlled substances, provided those drugs have been approved by the Food

and Drug Administration ("FDA") specifically for use in
addiction maintenance or detoxification treatment.  Currently,
the only approved medication for addiction treatment is
buprenorphine (brand name Suboxone, Subutex), a Schedule III
controlled substance.

        ii.    The practitioner must be a "qualifying
physician," meaning he is licensed under state law and has
specific medical certification, training, or experience in
maintenance or detoxification treatment as specified in the
Controlled Substances Act.

    11.  <u>Erica Regina GARCIA</u>: As is described in further detail
below, evidence shows that GARCIA is a "patient" of PHAM and she
is receiving large quantities of controlled substances from PHAM
under her name and her boyfriend/cohabitant's name and is
further distributing the controlled substances.

**C.**   <u>**Overview of the law and policy regarding prescription
medication**</u>

    12.  Based on my training and experience, and information
obtained from other law enforcement personnel, I know that the
distribution of controlled substances must meet certain federal
rules and regulations.  Specifically, I know the following:

        a.  21 U.S.C. § 812 establishes schedules for
controlled substances that present a potential for abuse and the
likelihood that abuse of the drug could lead to physical or
psychological dependence.  Such controlled substances are listed
in Schedule I through Schedule V depending on the level of
potential for abuse, the current medical use, and the level of

possible physical dependence.  Controlled substance
pharmaceuticals are listed in Schedules II through V because
they are drugs for which there is a substantial potential for
abuse and addiction.  There are other drugs available only by
prescription but not classified as controlled substances.  Title
21 of the Code of Federal Regulations, Part 1308, provides
further listings of scheduled drugs.

   b. Pursuant to 21 U.S.C. § 822, controlled
substances may only be prescribed, dispensed, or distributed by
persons registered with the Attorney General of the United
States to do so (with some exceptions, such as delivery
persons).  The Attorney General has delegated to the DEA
authority to register such persons.

   c. Under 21 U.S.C. § 823(f), DEA-registered medical
practitioners (including pharmacies, *see* 21 U.S.C. § 802(21))
must be specifically authorized to handle controlled substances
in any jurisdiction in which they engage in medical practice.

   d. 21 C.F.R. § 1306.04 sets forth the requirements
for a valid prescription.  It provides that for a "prescription
for a controlled substance to be effective [it] must be issued
for a *legitimate medical purpose* by an individual practitioner
*acting in the usual course of his professional practice*.  The
responsibility for the proper prescribing and dispensing of
controlled substances is upon the prescribing practitioner, but
a corresponding responsibility rests with the pharmacist who
fills the prescription."  (Emphases added.)

e.   21 C.F.R. § 1306.05 sets forth the manner of issuance of prescriptions.  It states that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use and the name, address, and registration number of the practitioner."

f.   21 C.F.R. § 1306.12 governs the issuance of multiple prescriptions and states:  "An individual practitioner may issue multiple prescriptions authorizing the patient to receive a total of up to a 90-day supply of a Schedule II controlled substance provided the following conditions are met:

i.   Each separate prescription is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice;

ii.   The individual practitioner provides written instructions on each prescription (other than the first prescription, if the prescribing practitioner intends for that prescription to be filled immediately) indicating the earliest date on which a pharmacy may fill each prescription;

iii.   The individual practitioner concludes that providing the patient with multiple prescriptions in this manner does not create an undue risk of diversion or abuse;

iv.   The issuance of multiple prescriptions as described in this section is permissible under the applicable state laws; and

v.     The individual practitioner complies fully with all other applicable requirements as well as any additional requirements under state law."

g.    California Health and Safety Code § 11172 states: "No person shall antedate or postdate a prescription."

h.    21 U.S.C. § 841(a)(1) makes it an offense for any person to knowingly and intentionally distribute or dispense a controlled substance except as authorized by law.  Distribution of a scheduled controlled substance in violation of 21 U.S.C. § 841(a)(1) by a medical doctor (often referred to as "diversion") occurs when a medical doctor knowingly and intentionally prescribes a controlled substance, knowing the drugs were controlled, for a purpose other than a legitimate medical purpose and outside of "the usual course of professional practice."  *See United States v. Moore*, 423 U.S. 122, 124 (1975) ("We . . . hold that registered physicians can be prosecuted under 21 U.S.C. § 841 when their activities fall outside the usual course of professional practice."); *see also United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006) ("[T]o convict a practitioner under § 841(a), the government must prove (1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs and with intent to

distribute them outside the course of professional practice.").

**D.   Overview of the standard of care in pain management**

13.   The Medical Board of California formally adopted a policy statement entitled, "Prescribing Controlled Substances for Pain."  The Medical Board's guidelines for prescribing a controlled substance for pain state that the practitioner must obtain a medical history and conduct a physical examination. Such history and exam include an assessment of the pain and physical and psychological function; substance abuse history; prior pain treatment; assessment of underlying or coexisting diseases and conditions; and documentation of the presence of a recorded indication for the use of a controlled substance.

14.   California Business and Professions Code, Section 2242(a), states that there must be a logical connection between the medical diagnosis and the controlled substance prescribed: "Prescribing, dispensing, or furnishing dangerous drugs . . . without an appropriate prior examination and a medical indication, constitutes unprofessional conduct."  A practitioner must make "an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country." *United States v. Hayes*, 794 F.2d 1348, 1351 (9th Cir. 2006).

**E.   Overview of pharmaceutical investigations**

15.   There is no statutory or regulatory definition of the phrase "outside the usual course of professional practice"; however, case law has provided guidance in this area.  "The term 'professional practice' refers to generally accepted medical

practice; a practitioner is not free deliberately to disregard prevailing standards of treatment." *United States v. Vamos*, 797 F.2d 1146, 1151 (2nd Cir. 1986). However, "the standard for criminal liability under § 841(a) requires more than proof of a doctor's intentional failure to adhere to the standard of care." *Feingold*, 454 F.3d at 1011. Criminal prosecution requires "proof beyond a reasonable doubt that the doctor was acting outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, *i.e.*, the personal profit of the physician." *Id.*, *quoting United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994).

16. Courts have generally recognized several factors evidencing that a physician's behavior was without a legitimate medical purpose and outside the usual course or scope of professional practice, examples of which include the following:[1]

    a.   The physician prescribed or dispensed an inordinately large quantity of controlled substances.

    b.   The doctor issued large numbers of prescriptions.

    c.   The patient received no or a very cursory physical examination.

    d.   The physician advised the patient to fill prescriptions at different pharmacies.

---

[1]   *See, e.g., United States v. Rosen*, 582 F.2d 1032, 1035 (5th Cir. 1978).

      e.   The doctor prescribed controlled substances at intervals inconsistent with legitimate medical treatment.

      f.   The physician used street slang rather than medical terminology for the drugs prescribed.

      g.   No logical relationship existed between the drugs prescribed and the treatment of the alleged condition.

      h.   The physician wrote more than one prescription in order to spread them out.

17.   In addition, the medical expert consulted in this investigation, Dr. Timothy Munzing, M.D., set forth specific criteria to consider when determining if a physician acted within the scope of professional practice. According to Dr. Munzing, in a pain management practice, a physician must have:

      a.   adequately evaluated the patient and used good judgment in developing a treatment plan;

      b.   practiced periodic clinical reviews;

      c.   obtained or contemplated specialty consultation;

      d.   kept and maintained complete and accurate medical records;

      e.   developed a working diagnosis and maintained a differential diagnosis;

      f.   offered alternative therapies and approaches to treating the disorder;

      g.   reviewed previous medical records, diagnostic work-up, and medical therapy;

      h.   developed a plan of action for future diagnostic evaluation;

       i.    developed a future plan of treatment; and

       j.    recorded objective measurements of pain levels, functional abilities, and emotional and psychological status.

**F.**    **The controlled substances discussed in this affidavit**

    18.   Based on my training and experience, and information obtained from other law enforcement personnel, I know the following about the controlled substances discussed often throughout this affidavit:

      a.   Oxycodone (brand name OxyContin, Percocet, Roxicodone) is a generic name for a narcotic analgesic classified under federal law as a Schedule II narcotic controlled substance. Oxycodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of moderate to severe pain. Oxycodone is sometimes referred to as "synthetic heroin" or "hillbilly heroin," and the effects, addiction, and chemical composition of oxycodone are extremely similar to heroin. An oxycodone prescription is generally issued for a modest number of pills to be taken over a short period of time because of the potential for addiction. OxyContin is a time-released formulation available in several strengths between 10mg and 80mg per tablet, designed for absorption into the system over the course of 10 to 12 hours. OxyContin was approved for use in 1996, and, by 2001, OxyContin was the largest grossing opiate pain reliever in the United States. In 2010, because of public pressure, the manufacturer reformulated OxyContin to make it more difficult to snort, smoke, or otherwise abuse, and changed the markings on the pill

from "OC" to "OP" to differentiate the newer tamper-proof
version.  Roxicodone is an immediate-release formulation
available in 5mg, 15mg, and 30mg tablets.  Because of the
immediate-release component, the potential for overdose and
death with Roxicodone is exponentially higher than OxyContin,
even though the tablet strength is less.  The street slang for
Roxicodone is "Roxy."  Oxycodone in either formulation is
extremely addictive and is a commonly abused controlled
substance that is diverted from legitimate medical channels.
Oxycodone typically has a street value of $10 to $15 per 30mg
tablet in the greater Los Angeles area.

     b.   Hydrocodone (Vicodin, Norco, and Lortab), also
prescribed as hydrocodone bitartrate-acetaminophen, is a generic
name for a narcotic analgesic classified under federal law as a
Schedule II narcotic drug controlled substance.  Hydrocodone,
when legally prescribed for a legitimate medical purpose, is
typically used for the relief of mild to moderate pain.
Accordingly, the prescription is generally for a modest number
of pills to be taken over a short period of time.  Hydrocodone
is formulated in combinations of 5 to 10mg of hydrocodone and
325 to 750mg of acetaminophen.  Hydrocodone can be addictive and
is a commonly abused controlled substance that is diverted from
legitimate medical channels.  Hydrocodone typically has a street
value of $3 per 10mg tablet in the greater Los Angeles area.

     c.   Alprazolam (Xanax) is a generic name for a
Schedule IV benzodiazepine prescription drug.  When used for a
legitimate medical purpose, it is prescribed to treat such

conditions as anxiety, depression, and panic disorder.
Alprazolam comes in the following strengths: 0.25mg, 0.5mg, 1mg,
and 2mg.  The 2mg tablets are rectangular and often referred to
on the street as "bars" or "zanny bars."  Alprazolam can be
addictive and is a commonly abused controlled substance that is
diverted from legitimate medical channels.  Alprazolam typically
has a street value of $2 to $4 per tablet in the greater Los
Angeles area.

       d.   "Amphetamine salts" (Adderall) is a generic name
for a stimulant classified under federal law as a Schedule II
controlled substance.  It is also referred to as
dextroamphetamine saccharate and dextroamphetamine sulfate.
Amphetamine salts, when legally prescribed for a legitimate
medical purpose, are typically used to control Attention Deficit
Hyperactivity Disorder ("ADHD").  Amphetamine salts are
formulated in oral tablet strengths of 5mg, 7.5mg, 10mg, 12.5mg,
15mg, 20mg, and 30mg.  Amphetamine salts are also formulated
into extended release strengths of 5mg, 10mg, 15mg, 20mg, 25mg,
and 30mg per tablet.  Amphetamine salts can be addictive.
Adderall is a commonly abused controlled substance that is often
diverted from legitimate medical channels.  The short-acting
form of amphetamine salts (versus extended release) is more
likely to be diverted and abused.  Amphetamine salts are
sometimes diverted away from legitimate medical use to be abused
as an appetite suppressant (as are other amphetamines) and by
college students who take the drug to stay awake and study.
Amphetamine salts typically have a street value of $10 per

tablet in the greater Los Angeles area.

        e.    Carisoprodol (Soma) is a prescription drug
marketed since 1959.  It is a centrally acting muscle relaxant.
The diversion and abuse of carisoprodol have increased in the
last decade.  Carisoprodol, when legally prescribed for a
legitimate medical purpose, is used as an adjunct to rest,
physical therapy and other measures for relief of acute, painful
musculoskeletal conditions.  It is available as single-entity
tablets containing 250 mg or 350 mg carisoprodol, and as
combination tablets containing 200 mg carisoprodol, 325 mg
aspirin and 16 mg codeine phosphate.  The standard dosage for
adults is 250 mg to 350 mg three times daily and at bedtime.
Use in patients under age 12 is not recommended. According to
IMS Health™, there were approximately 8.5 million carisoprodol
products dispensed in the U.S in 2013.  According to the
Diversion Drug Trends, published by the DEA on the trends in the
diversion of controlled and non-controlled pharmaceuticals,
carisoprodol continues to be one of the most commonly diverted
drugs.  Diversion and abuse of carisoprodol is prevalent
throughout the country.  As of March 2011, street prices for
Soma ranged from $1 to $5 per tablet. Diversion methods include
doctor shopping for the purpose of obtaining multiple
prescriptions and forging prescriptions. As of January 11, 2012,
carisoprodol is a schedule IV controlled substance under the
Controlled Substances Act.

        f.    Tramadol was approved for marketing in the United
States as a non-controlled analgesic in 1995 under the trade

name of Ultram®.  Soon after its approval, however, there were reports of diversion and abuse of tramadol.  This led to FDA revisions to the product labeling and the addition of warnings about its abuse.  Tramadol is an opioid analgesic and opioid activity is the overriding contributor to its pharmacological effects.  Abuse and adverse events of tramadol are similar to those of other opioid analgesics.  Tramadol is approved for the treatment of moderate to moderately severe pain in adults. Tramadol is most commonly abused by narcotic addicts, chronic pain patients, and health professionals.  According to the American Association of Poison Control Centers, there were 12,108 tramadol exposures in 2016.  Of this total in 2016, there were 5,712 single substance exposures and 3 associated deaths. According to the National Survey on Drug Use and Health (NSDUH) in 2016, 1.6 million people in the U.S. aged 12 or older misused tramadol products in the past year. Tramadol is controlled in Schedule IV of the Controlled Substances Act.

g.    Buprenorphine hydrochloride, also called buprenorphine, was first marketed in the United States in 1985 as a schedule V narcotic analgesic.  Initially, the only available buprenorphine product in the United States had been a low-dose (0.3 mg/ml) injectable formulation under the brand name, Buprenex®.  Diversion, trafficking and abuse of other buprenorphine products have occurred in Europe and other areas of the world.  In October 2002, the FDA approved two buprenorphine products (Suboxone® and Subutex®) for the treatment of narcotic addiction.  Both products are high dose (2

mg and 8 mg) sublingual (under the tongue) tablets. Subutex® is a single entity buprenorphine product and Suboxone® is a combination product with buprenorphine and naloxone in a 4:1 ratio. After reviewing the available data and receiving a schedule III recommendation from the Department of Health and Human Services (DHHS), the DEA placed buprenorphine and all products containing buprenorphine into schedule III in 2002. Since 2003, diversion, trafficking and abuse of buprenorphine have become more common in the United States. In June 2010, FDA approved an extended release transdermal film containing buprenorphine (Butrans®) for the management of moderate to severe chronic pain in patients requiring a continuous, extended period, around-the-clock opioid analgesic for the treatment of opioid addiction by preventing the symptoms of withdrawal for heroin and other opioids. Based on my training and experience and discussions with other law enforcement personnel, I know that Suboxone is diverted and trafficked, especially into prisons and jails.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**Background**

19. PHAM is licensed with the DEA to operate his medical office at Irvine Village Urgent Care, 15435 Jeffrey Road #127, Irvine, California, **SUBJECT PREMISES 1.** PHAM writes controlled substance prescriptions for his "patients" under his DEA license numbers, BP3274254 and XP3274254. The facts set forth below show that PHAM is intentionally and knowingly prescribing narcotics to "patients" who are both abusing and diverting the

obtained pharmaceutical pills. Furthermore, based on the
intercepted letters detailed below, I believe that PHAM is
prescribing Suboxone, knowing that it is being smuggled into the
jails.

20. Since 2015, DEA Special Agents and Diversion
Investigators in the Riverside and Orange County offices have
been conducting an investigation of PHAM for narcotics diversion
related offenses. The investigation has revealed probable cause
to believe that PHAM and several of PHAM's associates are
knowingly diverting prescription narcotics, namely oxycodone
HCL, hydrocodone bitartrate-acetaminophen, amphetamine salt
combo, carisoprodol, tramadol HCL, among other controlled
substances.

21. I was informed by Diversion Investigator ("DI") Daniel
Gragg that in July 2015, the DEA Riverside District Office
("RDO") received information that Dr. Dzung PHAM, D.O., DEA
number BP3274254, has been prescribing an excessive amount of
narcotic controlled substances to patients without a legitimate
medical reason. The RDO Diversion Group conducted an initial
investigation into the prescribing habits of PHAM by analyzing
the State of California, Department of Justice's Controlled
Substance Utilization Review and Evaluation System ("CURES")
data and past investigative reports concerning PHAM. The CURES
database lists all scheduled drugs prescribed, including the
patient, doctor and pharmacy used for a specific prescription,
in addition to the date issued, quantity prescribed and strength
of the prescription. PHAM was identified as prescribing large

amounts of controlled substances to patients, many of whom are paying with cash and traveling long distances to see PHAM. Additionally, PHAM is believed to be directing the patients to specific pharmacies to fill the prescriptions, namely Bristol Pharmacy, because certain pharmacies will not fill PHAM's prescriptions.

**Background on Prescribing of and Abuse of Pharmaceutical Pills**

22. DI Stephanie Kolb is presently employed as a DI for the DEA and has been so employed since 2012. She has received approximately thirteen weeks of instruction in the investigation of controlled substance registrants (including doctors, physician assistants, and nurse practitioners) and major narcotics traffickers at the DEA Academy in Quantico, Virginia. Over the course of her employment as a DI, she has been the case agent or lead investigator on several federal investigations that have specifically involved the illegal trafficking of pharmaceutical controlled substances by medical doctors, physician assistants, and nurse practitioners, and has participated in multiple other investigations that involved the illegal diversion of pharmaceutical controlled substances. She has spoken on numerous occasions with pharmacists, physicians, DIs, Medical Board investigators, patients, and other witnesses having extensive knowledge of pharmaceuticals regarding the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances. She has participated in the federal prosecution and trials of physicians, physician assistants, and pharmacists.

23.   Based on her training and experience, DI Kolb informed me that individuals on the black market – both drug addicts and drug traffickers – often seek to abuse or sell narcotics such as those listed above in the oxycodone and hydrocodone paragraphs (¶¶ 18a, 18b) combined with drugs including benzodiazepines and muscle relaxants.  Examples of benzodiazepines include alprazolam (brand name Xanax), diazepam (brand name Valium), and clonazepam (brand name Klonopin), each of which are Schedule IV drugs, intended primarily for use in treatment of conditions such as anxiety or insomnia.  The primary muscle relaxant sought on the black market is carisoprodol (Soma), also a Schedule IV drug primarily used for treatment of physiological conditions such as muscle spasms.  Although those drugs are addictive and dangerous even taken alone, the combination of a narcotic with a benzodiazepine and/or a muscle relaxant magnifies the danger of the overall cocktail, and is known among law enforcement to be a major red flag of illicit diversion by medical practitioners such as doctors prescribing and/or pharmacists dispensing such cocktails.  A cocktail of all three categories of drugs (a narcotic, benzodiazepine, and muscle relaxant) is commonly referred to on the black market as the "holy trinity" and is among the most sought-after prescription drug cocktails by addicts and dealers.

**Analysis of PHAM's CURES Reports**

24.   I know having spoken with DI Gragg that in October 2017, Dr. Timothy A. Munzing, M.D., performed a medical expert review of PHAM's CURES reports at the request of DI Gragg.  The

following are some of the findings taken directly from Dr. Munzing's expert report:

      a.    The CURES database of controlled substance prescriptions written by PHAM for patients between October 2014 and October 2017 was reviewed. During this timeframe, 52,419 prescriptions and 1,234,507 dosage units were written to approximately 2,400 unique patients. This would equate to 334 prescriptions weekly over this 3-year span, assuming no holidays or vacations. This is an extremely high amount.

      b.    64% of these prescriptions were for patients in their 30s to 40s. This amount of prescribing for this age range is a red flag for abuse/diversion. Approximately 85% of the opioids prescribed were either oxycodone or hydrocodone. Alprazolam accounted for approximately 68% of the benzodiazepines prescribed. PHAM's prescribing of controlled substances increased by over 3,000 prescriptions between years 1 and 2 (22% increase) and 3% between years 2 and 3.

      c.    Twenty-five patients were selected for a more detailed documented review, based on potential significant areas of concern as far as the prescribing patterns identified. In fact, many other patients on the CURES database had similar findings and could have been chosen. After the twenty-five patients were selected, they were further analyzed for the specific patient demographics, and the detailed prescribing specifics by patient and specific drug.

      d.    According to the expert report, these twenty-five patients all had concerning findings, including the overall

numbers of prescriptions.  Though it was not possible to give a final conclusive opinion as to whether these medications were prescribed for a medically legitimate purpose in the usual course of professional practice (Title 21), based on the findings, and Dr. Munzing's extensive experience reviewing such cases, he found to a very high level of certainty that after review of the medical records, once obtained if they exist, PHAM failed to meet these requirements in prescribing these dangerous medications.

      e.    PHAM's prescribing patterns are highly suspicious for medication abuse and/or diversion.

      f.    A selection of areas of concern include, but are not limited to:

      i.    Very large number of controlled substance prescriptions written;

      ii.    Frequently multiple dangerous prescriptions prescribed on the same date and concurrently – putting the patient at higher risks for addiction, overdose, and overdose death;

      iii.    Morphine Equivalent Dosing over 100 mg/day – putting patients at higher risk of overdose and overdose death;

      iv.    Early refills for many patients;

      v.    Some patients are using multiple pharmacies to fill their medications, a red flag for abuse/diversion.

      g.    Although twenty-five patients for whom the prescribing patterns were highly suspicious for each one, with multiple red flags for abuse/diversion, these represent only a

fraction of the total patients with suspicious prescribing patterns found during the CURES review.

25.  In October 2018, I requested DI Kolb to review PHAM's current CURES reports.  DI Kolb informed me that she reviewed CURES data for drugs prescribed by PHAM for the approximate time period of January 2018 to September 2018.  DI Kolb's review of the data showed what she recognized to be red flags reflecting the illicit diversion of controlled substances.

a.    For example, of the approximately 79,736 dosage units for oxycodone in tablet form, approximately 63% (51,226 units) were for maximum strength 30-mg oxycodone.

b.    For example, of the approximately 218,972 dosage units for hydrocodone in tablet form, approximately 95% (209,224 dosage units) were for maximum strength 10-mg hydrocodone.

c.    DI Kolb also observed that PHAM was prescribing large volumes of benzodiazepines.  For example, the CURES data reflects 151,654 total dosage units for alprazolam.  Notably, approximately 78% of these prescriptions (118,992 dosage units) were for 2-mg alprazolam, the maximum strength tablet of the drug available at retail pharmacies, which DI Kolb knows is a drug that even psychiatrists will not ordinarily prescribe for outpatient treatment.  Similarly, of the 22,154 dosage units for diazepam, approximately 78% (16,873 dosage units) are for maximum strength 10-mg.  DI Kolb informed me that to the best of her knowledge, PHAM has no advertised specialty in psychiatry. DI Kolb further informed me that large volumes of benzodiazepines prescribed by a non-psychiatric specialist,

24

particularly when prescribed in combinations with narcotics, is a major red flag of illicit diversion.

        d.    The CURES data also shows 71,819 dosage units for carisoprodol (Soma), 100% of those entries are at maximum strength 350-mg. DI Kolb observed repeated entries throughout the CURES data of patients simultaneously filling PHAM prescriptions for dangerous combinations, such as combinations of narcotics with benzodiazepines and/or Soma.

        e.    In addition to the high volume of maximum strength controlled substances being filled, another red flag DI Kolb noted is that PHAM patients similar in age reside at the same addresses of other PHAM patients. She also noted that patients are receiving similar medications in combination and the same dosage unit to patients that are family members or friends. This was determined by the address listed on the prescriptions filled in CURES. The majority of these patients are all between the ages of 25 and 40.

**Undercover Visit on June 7, 2018**

    26.  DI Gragg informed me that on June 7, 2018, RDO conducted an undercover operation at PHAM's office located at 15435 Jeffery Rd, Unit 127, in Irvine, California. A DEA SA acted as the undercover agent ("UCA") who entered the business to attempt to acquire a prescription from PHAM. The UCA was equipped with a covert recording device. The following are the details of the visit as documented in a DEA report by the UCA:

        a.    At approximately 10:15 a.m., the UCA entered PHAM's office. Upon entering the facility, the UCA was greeted

by a female receptionist, and the receptionist asked the reason

for the UCA's visit. The UCA stated she wanted to discuss an

antibiotic prescription with the doctor. The receptionist asked

more questions about the UCA's symptoms and the UCA stated she

preferred to discuss that with the doctor. The receptionist

asked if the UCA was a new patient, to which the UCA confirmed

that she was. The receptionist asked the UCA to fill out

patient information on a tablet on the counter and to fill out a

few forms. Information on the forms requested, among other

items: name, date of birth, home address, occupation, allergies,

and emergency contact. Meanwhile, the receptionist asked to

make a copy of the UCA's driver license. After the UCA stated

that she did not have insurance, the receptionist told the UCA

that the cost of the visit would be $150.00. The UCA gave the

receptionist two $100 bills and asked how long the wait would

be, to which she was told "over an hour." The UCA told the

receptionist that she would be back around 12:00 p.m., and the

receptionist stated that the UCA's $50.00 in change would be

given to her upon her return. At approximately 10:30 a.m., the

UCA departed the doctor's office.

        b. At approximately 12:00 p.m., the UCA returned to

PHAM's office. Upon entering the reception area, the same

receptionist from earlier greeted the UCA and gave her $50.00 in

return from the earlier cash payment. At this time, the UCA was

called to the back of the facility to be examined. The UCA was

greeted by another female staff member who took the UCA's blood

pressure, as well as height and weight.  The staff then escorted the UCA to an examination room to wait for PHAM.

c.    Shortly afterward, PHAM entered the room and greeted the UCA.  PHAM began to question the UCA about a supposed "stomach issue" presented by the UCA and discussed antibiotics.  The UCA and PHAM discussed symptoms in more detail.

d.    Later into the discussion, the UCA presented a "lower back pain" issue and further discussed symptoms with PHAM.  PHAM suggested a number of stretching exercises and gave the UCA tip sheets for such exercises.  PHAM asked if the UCA had ever received an x-ray exam for her lower back, to which the UCA replied, "No."  PHAM asked the UCA to stand upright and commented on the UCA's spinal posture.  After further discussion of the UCA's "lower back pain," PHAM pulled out prescription pads and began writing on them.  PHAM explained that he recommended a muscle relaxer as well as a sleep aid for the UCA, and wrote prescriptions for both carisoprodol and naproxen.  At this time, the UCA asked if PHAM recommended a pharmacy in the local area to get the prescriptions filled.  PHAM suggested eLong Pharmacy, located at 15415 Jeffrey Road #108, Irvine, California.

e.    The UCA reiterated that she needed something to aid the pain of her lower back.  PHAM asked if the UCA had used drugs for pain before, to which the UCA stated "Vicodin," and also stated that the Vicodin made the UCA nauseous.  PHAM again pulled out his prescription pad and began writing a prescription

for hydrocodone.  While doing so, PHAM asked if the UCA had gone to a particular pharmacy to fill medications in the past.  The UCA stated that she filled prescriptions at CVS Pharmacy.  At this time, PHAM paused and explained to the UCA that "CVS will not fill this prescription," motioning toward the writing pad in hand.  PHAM stated that the UCA should go to "Bristol Pharmacy" and talk to "Jennifer."  PHAM stated that he had a business card for Jennifer N.

f.   At the end of the examination, PHAM walked the UCA out toward the reception desk and handed the UCA two business cards: one for eLong Pharmacy and one for Jennifer N. at Bristol Pharmacy.  At this time, another female receptionist asked to make photo copies of the prescription slips from PHAM. The UCA handed the prescriptions to the receptionist who made the copies and then the UCA received the prescriptions back. Shortly after, the UCA departed the facility.

g.   At approximately 1:00 p.m., the UCA entered Bristol Pharmacy located at 250 E Yale Loop Unit C, Irvine, California.  The UCA observed a female behind the counter, whose name tag read "Jennifer [N.]"  The UCA greeted Jennifer and stated that she had just come from PHAM's office.  Jennifer N. then asked the UCA if it was her first time coming to this pharmacy, to which the UCA affirmed.  Jennifer N. looked at the prescriptions and at the UCA's driver license.  When Jennifer N. looked at the written prescription for hydrocodone, she showed the prescription to the UCA and asked if the UCA wanted the

"yellow ones," to which the UCA affirmed. Jennifer N. told the UCA to wait for approximately ten minutes.

       h.   Several minutes later, Jennifer N. called the UCA to the counter and explained to the UCA how to take the prescribed medications. Jennifer N. opened a bottle which contained the hydrocodone pills, showed the UCA the contents, and then closed the bottle.

       i.   It is the UCA's belief that Jennifer N. opened the hydrocodone bottle to show the UCA the yellow color of the pills. Jennifer N. asked the UCA if she had insurance, to which the UCA stated she did not. Jennifer N. stated that the total amount due for the prescriptions was $80.00 ($45.00 for the hydrocodone pills and $35 for the remaining prescriptions). The UCA paid for the medication and departed the pharmacy.

**Undercover Doctor Visit on July 3, 2018**

    27.  On July 3, 2018, DEA RDO conducted another undercover operation at PHAM's office located at 15435 Jeffery Rd, Unit 127, in Irvine, California. The same UCA entered the business equipped with two covert recording devices to attempt to acquire a prescription from PHAM. The following are the details of the visit as documented in a DEA report by the UCA:

       a.   At approximately 12:30 p.m., the UCA entered PHAM's medical office in order to complete an undercover office visit with PHAM. Upon entering the facility, the UCA was greeted by a female receptionist. The UCA stated that she wanted a refill of prescriptions. The receptionist stated that the UCA would need to call the office a day prior to refills.

The UCA asked if she can be seen by PHAM to discuss other things regarding the medication. The receptionist asked for which medication the UCA needed a refill. Initially, the UCA did not discuss the specific medication with the receptionist. After the receptionist pressed the UCA for a specific medication that needed filling, the UCA stated "Norco." The receptionist told the UCA that the cost for the visit would be $100.00, at which time the UCA paid the fee in cash to the receptionist. The UCA asked the receptionist if PHAM takes appointments, to which the receptionist stated that PHAM's office accepts walk-ins only. The UCA was asked to wait for PHAM to see her. While waiting, the receptionist asked the UCA if she previously filled her prescriptions at "Bristol Pharmacy," to which the UCA said yes.

      b.    At approximately 1:00 p.m., the UCA was called to the examination room to be seen by PHAM. Sometime after being seated in the exam room, PHAM entered the room and greeted the UCA. PHAM began to question the UCA about previously prescribed medications to include the hydrocodone and carisoprodol. The UCA stated that she had been taking the muscle relaxer "as needed," and that a refill for the hydrocodone was needed. PHAM asked more questions regarding the UCA's need for further medication. During the conversation, PHAM asked if the UCA had ever received an x-ray for her lower back, to which the UCA stated, "No." PHAM suggested that the UCA obtain a lower back x-ray in order to "justify" the continued prescription of hydrocodone. PHAM asked the UCA to stand up and face away from him. The UCA stood up, and PHAM pointed to various areas around

the UCA's lower back and asked the UCA to specify troublesome areas. After discussing this, PHAM told the UCA that he would be prescribing a two-month supply of hydrocodone and began writing in his prescription pad.

       **c.**    The UCA presented that she had been experiencing stressful situations that related to her family and she believed this was triggering the problems with her back area. PHAM agreed that high stress can trigger other health problems and noted that the UCA had a high pulse reading. The UCA further discussed "family issues" with PHAM and stated that she cannot sleep at night. PHAM initially offered the UCA a sleeping aid, but the UCA stated that the problem is not sleep-related. PHAM told the UCA that he can prescribe something else, but wanted to make the UCA aware of what is called a "triple threat," when certain medications are combined dangerously, and can cause death if misused.

       **d.**    Having spoken with other investigators and medical experts, I know that a "Triple threat," also referred to as a "Holy Trinity," is the combined use of an opioid (such as hydrocodone), a benzodiazepine (such as Valium), and carisoprodol (a muscle relaxer like Soma). During the last visit to PHAM by the UCA in June 2018, PHAM prescribed carisoprodol, as well as hydrocodone and naproxen. During this visit, PHAM prescribed hydrocodone, naproxen, and a benzodiazepine. After discussing this, PHAM began writing on his prescription pad and recommended a low dose of Valium for the UCA. PHAM asked where the UCA would get the prescriptions

filled, and the UCA stated "Bristol."  Shortly after PHAM wrote the prescriptions, the UCA exited the examination room with the two prescriptions.

     e.    The UCA met with a male receptionist outside the exam room, who asked to make photocopies of the UCA's prescriptions.  The UCA observed the receptionist make copies of the two prescriptions before the UCA departed the office.

     f.    At approximately 1:41 p.m., the UCA arrived at Bristol Pharmacy, located at 250 E Yale Loop Unit C, Irvine, California.  Upon entering, the UCA recognized Jennifer N. from her previous visit to Bristol Pharmacy on June 7, 2018.  The UCA approached Jennifer N. and stated that she just came from PHAM's office.  Jennifer N. reviewed the UCA's prescriptions and stated that she cannot fill the Valium because the UCA was prescribed 2mg tablets and the pharmacy does not carry those.  Jennifer N. stated that PHAM "usually prescribes 10mg" tablets and that is all the pharmacy has on site.  Afterward, Jennifer N. told the UCA that the other prescription would be filled in approximately 15 minutes.

     g.    A short time later, Jennifer N. called the UCA to the counter and opened the bottle containing hydrocodone/"Norco."  The UCA observed that they were large, oval-shaped white pills and asked if she can have the "yellow ones," the same from the previous visit in June.  Jennifer N. stated that the yellow pills cost more.  When the UCA asked how much the yellow Norco pills cost, Jennifer N. stated that the white ones were $1.25 per pill and the yellow ones were $1.75

per pill, and that the order would be approximately $30.00 more.
The UCA asked Jennifer N. to exchange the white pills for yellow
ones, and Jennifer N. stated it would be done within five
minutes.  Shortly after, Jennifer N. showed the UCA the yellow
Norco pills.  Jennifer N. told the UCA that the total for the
prescriptions would be $113.00, and the UCA paid Jennifer N. in
cash and departed the pharmacy.

       h.    The UCA noted a difference in price from the
first visit to the second.  During the first visit on June 7,
2018, the UCA paid Bristol Pharmacy $45.00 for 30 tablets of the
yellow hydrocodone pills.  However, during this visit, the UCA
paid $113.00 for 60 tablets of the yellow hydrocodone pills,
which is not consistent with the pricing on June 7, 2018.  In
addition, the UCA paid Bristol Pharmacy $10.00 for 60 tablets of
naproxen on June 7, 2018, but paid Bristol Pharmacy $8.00 for
the same quantity of naproxen during the July visit.

    28.  I reviewed the video of the UCA visit and observed
patient files to be on the wall behind the reception desk.  I
also observed a computer located at the reception desk.  There
also appeared to be another computer located in the office area
beyond the waiting room.  DI Hadland informed me that she
observed in the video a computer located in an exam room.  When
the UCA was in the exam room with PHAM, the UCA observed PHAM
writing notes in the UCA's physical patient file.  The UCA also
noted that before the UCA departed PHAM's office, an office
worker took a photocopy of the UCA's prescription.  The
photocopier was located behind the reception desk.

Case 8:18-mj-00406-DUTY SEALED *SEALED* Document 1 Filed 12/13/18 Page 44 of 130 Page ID #:44
Case 8:18-mj-00406-DUTY SEALED *SEALED* Document 1 Filed 12/13/18 Page 35 of 105
Page ID #:35

**PHAM's Patients Believed to be Diverting Pharmaceutical Pills**

29.   On February 27, 2018, DEA Orange County received an anonymous tip via email stating, in part: "Phone #s of pill dealers: . . . 714-xxx-1255," which is the telephone number for Erica GARCIA, a known patient of PHAM's as detailed below.

30.   Orange County Sheriff's Deputy and DEA Task Force Officer Michael Thalken ("TFO Thalken") conducted a DEA records check of GARCIA's telephone number and discovered on June 10, 2014, SA Wass and SA Allen of the DEA, Portland Oregon Tactical Diversion Squad arrested R.P. during the service of a federal search warrant in Buena Park, California.  SA Wass and SA Allen conducted a Miranda interview of R.P. who admitted to selling oxycodone, a scheduled II narcotic controlled substance.  During the interview, R.P. stated he bought 30 mg oxycodone pills from "Erica" (later determined to be GARCIA at 714-xxx-1255).  R.P. stated "Erica" would sell him approximately 25 to 30, 30-mg oxycodone pills at a time for approximately $15 to $17 dollars per pill.  R.P. described Erica as a short white female with long black hair who lives in Costa Mesa or Irvine, California.

31.   TFO Thalken obtained, pursuant to a Grand Jury Subpoena, CURES records regarding GARCIA from January 3, 2018, through June 28, 2018.  An analysis of GARCIA's CURES report of the scheduled prescriptions GARCIA obtained from January 3, 2018, to June 28, 2018, shows GARCIA obtained thirty-two individual prescriptions on nine separate dates from Dzung PHAM, D.O., in Irvine, California.  The records further show GARCIA has been obtaining prescriptions for high dose and large

34

quantities of narcotics- and amphetamine-based prescriptions. The CURES records for GARCIA's prescriptions from PHAM from January 3, 2018, to June 28, 2018, show the following:

a.    GARCIA obtained from PHAM seven separate prescriptions for 150 pills of 30-mg oxycodone HCL pills, totaling 1,050 pills of oxycodone HCL, a schedule II controlled narcotic.  Based on my training and experience, I know oxycodone HCL is a narcotic-based prescription drug that is highly addictive and often diverted and abused.  I also know that 30-mg of oxycodone HCL pills is an extremely high dose and 150 pills is a very large monthly quantity, both indicative of a high opioid tolerance from long term use and/or being illegally diverted to the street.

b.    GARCIA obtained from PHAM seven separate prescriptions for 150 pills of hydrocodone bitartrate-acetaminophen 10/325-mg pills, totaling 1,050 pills of hydrocodone, a schedule II controlled narcotic.  Based on my training and experience, I know hydrocodone bitartrate-acetaminophen is a narcotic-based prescription drug that is highly addictive and often diverted and abused.  I also know that 10/325-mg of hydrocodone bitartrate- acetaminophen pills is a high dose and 150 pills is a very large monthly quantity, both indicative of a high opioid tolerance from long term use and/or being illegally diverted to the street.

c.    GARCIA obtained from PHAM four separate prescriptions for 120 pills of tramadol HCL 50-mg pills, totaling 480 pills of tramadol HCL, a schedule IV controlled

narcotic. Based on my training and experience, I know tramadol HCL is a narcotic-based prescription drug that is highly addictive and often diverted and abused. I also know that 50-mg pills is an extremely high dose and 120 pills is a very large quantity, both indicative of a high opioid tolerance from long term use and/or being illegally diverted to the street.

d. GARCIA obtained from PHAM six separate prescriptions for 90 pills of carisoprodol (Soma) 350-mg pills, totaling 540 pills of carisoprodol, a schedule IV controlled depressant. Soma is a depressant that can produce a euphoria effect in high doses. I also know that 350-mg pills is an extremely high dose and 120 pills is a very large quantity, indicative of being diverted illegally to the street.

e. GARCIA obtained from PHAM six separate prescriptions for 90 pills of dextroamphetamine saccharate, amphetamine aspartate, dextroamphetamine sulfate, amphetamine sulfate 30-mg pills, totaling 540 pills of a schedule II controlled stimulant. Based on my training and experience, I know dextroamphetamine saccharate, amphetamine aspartate, dextroamphetamine sulfate, amphetamine sulfate is a stimulant. I also know 30-mg is an extremely high dose. The amounts of pills obtained are indicative of them likely being diverted illegally to the street.

f. GARCIA obtained from PHAM two separate prescriptions for 180 pills of amphetamine salt combo 30-mg pills, totaling 360 pills of a schedule II controlled stimulant. Based on my training and experience, I know amphetamine salt

combo is commonly sold as "Adderall." I also know 30-mg is an extremely high dose and 120 pills is a very large quantity, indicative of being diverted illegally to the street.

32. While reviewing CURES reports related to PHAM, TFO Thalken and I discovered another individual, E.S., with a date of birth of May 3, 1982, receiving large quantities of prescriptions from PHAM with the same listed address of record as GARCIA, 56 Rush Lily, Irvine, California.[2]

33. Further analysis of the CURES reports related to the prescriptions E.S. received from PHAM from January 3, 2018, through June 28, 2018, shows the following:

a. E.S. obtained from PHAM six separate prescriptions for 150 pills of 30-mg oxycodone HCL pills, totaling 900 pills of oxycodone HCL, a schedule II controlled narcotic.

b. E.S. obtained from PHAM six separate prescriptions for 150 pills of hydrocodone bitartrate-acetaminophen 10/325-mg pills, totaling 900 pills of hydrocodone, a schedule II controlled narcotic.

c. E.S. obtained from PHAM three separate prescriptions for 150 pills of tramadol HCL 50-mg pills, and two (2) separate prescriptions for 180 pills of tramadol HCL 50-mg pills, totaling 810 pills of tramadol HCL, a schedule IV controlled narcotic.

---

[2] Based on surveillance and records from Southern California Edison, I know that GARCIA and E.S. lived at 56 Rush Lily, Irvine, California, until approximately July 31, 2018, and subsequently moved to 141 Port, Irvine, California, **Subject Premises 3,** on or about July 31, 2018.

    d.    E.S. obtained from PHAM six separate prescriptions for 90 pills of carisoprodol 350-mg pills, totaling 540 pills of carisoprodol, a schedule IV controlled depressant.

    e.    E.S. obtained from PHAM three separate prescriptions for 90 pills of dextroamphetamine saccharate, amphetamine aspartate, dextroamphetamine sulfate, amphetamine sulfate 30-mg pills, totaling 270 pills of a schedule II controlled stimulant.

    f.    E.S. obtained from PHAM three separate prescriptions for 90 pills of amphetamine salt combo 30-mg pills, totaling 270 pills of a schedule II controlled stimulant.

34.  TFO Thalken also conducted other record checks related to GARCIA and E.S., whereby he informed me that there have been two separate domestic violence incidents between GARCIA and E.S. documented by the Irvine Police Department ("IPD") on February 19, 2016, and May 13, 2016, at 56 Rush Lily, Irvine, California. On May 13, 2016, IPD arrested E.S. for California Penal Code § 273.5(A) (Inflict Corporal Injury on a Spouse/Cohabitant). According to the IPD Report from the May 13, 2016, incident, GARCIA stated that she and E.S. have been dating and cohabitating for two and a half years and have a child together. She also stated that E.S. was a recovering drug addict.

35.  I conducted a toll analysis of PHAM's telephone number, 949-xxx-7044, and GARCIA's number, 714-xxx-1255, and compared the times PHAM and GARCIA exchanged text messages with

the days GARCIA filled PHAM's prescriptions based on CURES reports.

    a.    On July 30, 2018, PHAM and GARCIA exchanged four text messages.  On or about July 31, 2018, GARCIA filled prescriptions from PHAM for oxycodone HCL, amphetamine salt combo, tramadol HCL, and hydrodone bitartrate-acetaminophen.

    b.    On August 1, 2018, PHAM and GARCIA exchanged six text messages.  On or about August 2, 2018, GARCIA filled a prescription from PHAM for carisoprodol.

    c.    On August 27, 2018, PHAM and GARCIA exchanged twelve text messages, and on August 30, 2018, PHAM and GARCIA exchanged four more text messages.  On or about August 30, 2018, GARCIA filled prescriptions from PHAM for oxycodone HCL, amphetamine salt combo, tramadol HCL, hydrodone bitartrate-acetaminophen, and carisoprodol.

36.  Though GARCIA and E.S. obtain similar prescriptions from PHAM, CURES reveals that GARCIA and E.S. filled prescriptions from PHAM on different dates.  Since January 2018, GARCIA and E.S. have never filled prescriptions from PHAM on the same day.  Based on my training and experience and having spoken with other investigators, I believe the dates on which the prescriptions are filled by GARCIA and E.S. may be staggered on purpose to not draw attention to the high volume of narcotics prescriptions that are going to one residence.

37.  Based on my training and experience, the totality of this investigation, and consultation with other law enforcement agents, I believe that based on the drugs that PHAM is

prescribing--the "Holy Trinity" or the "Triple Threat"--to
GARCIA and E.S., who live together, specifically the combination
of drugs being prescribed (including the same drugs prescribed
to both GARCIA and E.S.) during the same timeframe, the high
dosage of the drugs, and the large quantity in each
prescription, that GARCIA is diverting the drugs illegally to
the street and illegally distributing controlled substances.

**Intercepted Orange County Jail Communications**

38.  On July 24, 2018, Orange County Sheriff's Department
("OCSD") Investigator Lee provided TFO Thalken with a letter
that was found by Santa Ana Police Officer P. Beaumarchais
during a traffic stop.  The traffic stop was conducted of known
gang members and the letter was located in the vehicle.  Upon
reading the letter, Officer Beaumarchais recognized the contents
of the letter to contain information regarding narcotics
trafficking in the jails.  Officer Beaumarchais seized the
letter for further investigation.  As part of the investigation,
OCSD Custody Intelligence Unit was notified and alerted to the
issues.  Investigator Lee recognized the recipient of the letter
to be Lorenzo G., also known as "Lalo".  The author of the
letter addressed himself as Lalo's Tio, who Investigator Lee
believed to be Natividad G., currently an inmate of the Orange
County Jail.  Below is a transcription of the letter that was
written in English and dated "7/11/18":

a.  Ay Lalo this is your Tio ok. What this letter
says, can you please call this # & relay everything that I say
in the letter plz? 714-xxx-6696 "Downer" It's on behalf of Frost

& Tio that we said how much $ they have to give you for the Quarter pound of Window? We now it's 550$ we wanted to know if you can help us out & if yes how much $ do we have to give you to make it happen porfay. Also what name do you want us & send the 100$ for the DR. for the subs?  Give a name to my nephew or if a hyna will meet up with you to give you the $? Also the Dr is located @ IRVINE, his name is DR. PHAM! Tell the Dr that you have a couple gram habit a day & that his wife wants him to stop so he heard about the new thing called "Suboxin 8mg".  Tell him to look online for DR. PhAM IRVINE.com #  Then call the Dr & set the appointment & when he gets there to give the Dr. Personally the 100$ only the <u>DR. PHAM</u>! The Dr. is supposed to give you 2 priscription For 1 month 90 subs 8mg & the next month as well! But if he gives you 1 month dont trip get it, even if it's 30, 60, 90 get it plz!  Tell him Frost & Tio sends there [illegible] we got him on $ a extra for all his help! Spenga that we don't really got that much $ but you know what happened [illegible] were here with us in L! Tell Julio those [illegible] # plz! Also the 2 individuals that are suppose to help out is my brother & [illegible]!  Let's make this happen & make all of us $.  Gracias for your help & stay up!  Call Grinch 714-xxx-1064 & tell him if he can give you the oz of window to you Downer & if you can hold it plz? Gracias [illegible]. PS. LALO you can take a picture of it & send it to him or call him & Read it to him plz!  Also we haven't forgot about you. If this goes good we got you dont trip!  Also send me the baby pictures plz! Take care & stay up & God Bless you & Love you!  Your Tio!

39.   Based on my training, knowledge, experience, and having spoken with other investigators, I believe Natividad G. is asking "Lalo" to obtain Suboxone from PHAM for the purpose of smuggling the Suboxone into jail.  Furthermore, I believe PHAM likely knows that the Suboxone is going into the jails when Natividad G. tells Lalo to tell PHAM "Frost & Tio sends there [illegible]" and they "got him on $ a extra for all his help."

40.   Investigator Lee informed TFO Thalken and me that Suboxone is currently one of the most trafficked narcotics in the Orange County Jail system with strips of Suboxone being sold for $100-$150 each.

41.   On or about August 1, 2018, TFO Thalken and I were also made aware of intercepted jail communications, also called "kites," that were seized at the Theo Lacy jail facility in Orange County, California.  Investigator Lee provided TFO Thalken with the report referring to the intercepted kites from an Orange County Jail inmate that mentioned using PHAM to obtain Suboxone and Xanax that could be smuggled into the jail and for the inmate to distribute and sell the drugs in the jail.

**Interview of CVS Pharmacist on September 27, 2018**

42.   On September 27, 2018, DI Kolb and I interviewed a pharmacist at the CVS Pharmacy located within Target at 3750 Barranca Parkway, Irvine, CA 92606.  The pharmacist stated that she and the other pharmacists decided to stop accepting PHAM's prescriptions for opiates approximately five years ago.

43.   She stated that many of the patients coming in with prescriptions from PHAM were very young in age and would often

pay cash for their prescriptions. She also mentioned that the amount of opiates being prescribed was significant and excessive. She mentioned that she would see prescriptions for 120 10-mg Norcos. She stated that she and the other pharmacists would call PHAM's office and inquire why there were so many opiates being prescribed and would ask him what his diagnosis was for the patient for whom he was prescribing large amounts of opiates. She indicated his explanations were insufficient so she and her co-workers decided to stop accepting his prescriptions.

44. She also said that when that pharmacy became a CVS pharmacy around December 2015, she and her co-workers were made aware that CVS as a company had stopped accepting PHAM's prescriptions.

**Interview of Spouses of PHAM's Patients on October 16, 2018**

45. On October 16, 2018, California Medical Board Investigator Amber Driscoll and I interviewed R.C. to discuss her complaint to the Medical Board of California regarding PHAM. The following is a summary of the interview:

a. R.C. stated that her husband, T.C., struggles with an opioid addiction and is currently a patient of PHAM's. He is also currently under the care of a primary care physician through their medical insurance. He is also seeing a psychiatrist for the treatment of addiction. The psychiatrist is prescribing buprenorphine (Suboxone) and anti-depressants.

b. She stated that she believed T.C. called PHAM two weeks prior for a Suboxone prescription. PHAM now bills the

visits through their insurance.  Previously, T.C. would try to
hide the fact that he was going to PHAM, so he would pay cash.
When the money ran out, he started using the insurance.  When
T.C. was going on a regular basis to PHAM, he would go as often
as every two to three weeks.

      c.   R.C. said that T.C. would get prescriptions for
Suboxone and oxycodone filled at the same pharmacy.  In April
2017, T.C. was hospitalized for Xanax withdrawal seizures.  He
was in the hospital for one week.  At that time, one of the
physicians told her that he ran a report (CURES) for T.C. and
that PHAM was prescribing a dangerous amount of drugs to T.C.
and suggested that she should report PHAM to the Medical Board.
T.C. was taking six to eight oxycodone and Xanax at the same
time on a daily basis.

      d.   R.C. stated she and T.C. have been together for
ten years and she thinks he became addicted to oxycodone and
Xanax in 2013.  She became aware of PHAM prescribing to T.C. in
2017.  She does not know how T.C. started seeing or initially
heard of PHAM, but she believes it was simply through the
grapevine.  She stated T.C.'s addiction has gotten significantly
worse over the last two years.

      e.   When asked if she had ever been to PHAM's office,
she said no.  She has never been to PHAM's office with her
husband or as a patient.  When asked if she thought her husband
would ever use her driver's license to obtain a prescription,
she said she did not know.  She stated she has found her

driver's license in his wallet before, and there was no reason
for him to have it.

        f.    R.C. stated that on December 25, 2017, T.C.
entered a VA rehabilitation facility and was released in
February 2018.  She stated that T.C. told PHAM he had been in
rehab; however, R.C. found prescriptions written by PHAM after
that time.  In May 2018, T.C. went to rehab again.  She stated
that T.C. told her a few weeks ago that PHAM would not prescribe
to him anymore, except for Suboxone and anti-inflammatories,
because PHAM knows he is an addict.  He also told her PHAM would
not prescribe to him anymore after he completed rehab in
February 2018.

        g.    R.C. stated that T.C. usually goes to HV Pharmacy
or Tower Pharmacy.  T.C. told her that HV Pharmacy has an
agreement with PHAM, so PHAM can call in prescriptions because
PHAM knows the pharmacist and can call her to fill
prescriptions.

        h.    I conducted a review of CURES and found three
prescriptions in R.C.'s name for oxycodone and diazepam
prescribed by PHAM dated August 4th, 20th, and 27th of 2018.
Based on our interview of R.C. in conjunction with the CURES
report, Investigator Driscoll and I believe PHAM prescribed
oxycodone for T.C. in R.C.'s name in order to give T.C. extra
oxycodone prescriptions.  Per CURES, T.C. received a
prescription of oxycodone from PHAM on August 6th, 14th, 30th,
and on September 4th of 2018.  Furthermore, on September 7 of

2018, PHAM wrote T.C. a prescription for buprenorphine hydrochloride (Suboxone).

46. On October 16, 2018, Investigator Driscoll and I interviewed M.K. to discuss her complaint to the Medical Board of California regarding PHAM. The following is a summary of the interview:

     a.   M.K. stated she has been separated from her husband, A.K., since January 2018 due to his long-time addiction. She stated A.K. completed a 28-day rehab program three weeks ago.

     b.   She stated they have been together since 2010, at which time A.K. was completing a court-ordered rehab. She stated his addiction to prescription pills began after high school. A year after they started dating, she noticed A.K.'s behavior changed and she could tell he was under the influence of prescription pills.

     c.   She became aware of PHAM when she found prescription bottles for A.K. strewn about their house. Sometimes, she would even find random pills on the ground. In 2013, she told A.K. that she wanted to talk to PHAM. She and A.K. went together to talk to PHAM. PHAM seemed concerned about the pills A.K. was taking. PHAM knew A.K. had been to rehab for opioid addiction and M.K. said that he acted as if he wanted to help. PHAM had a report of all the medications he had prescribed to A.K. and told her he did not know how A.K. was finishing the medications so fast. PHAM told them he would prescribe something so A.K. would be able to wean off the drugs,

but M.K. could not recall the name of the medication.  For the first few days, she would hand A.K. the pill when he was supposed to take it.  After that, she gave the prescription to him to take on his own.  M.K. described PHAM's waiting room as full of addicts.

> d.    A.K. told her that some of the pharmacies do not fill PHAM's prescriptions.  Approximately three to four months after speaking with PHAM, M.K. found pills on the floor again.  Over the years, they tried to talk it out.  A.K. again went to an outpatient rehab treatment, but would eventually relapse.

> e.    In January 2017, M.K. asked A.K. to move out of the house.  He went to another outpatient rehab program and changed jobs.  In May 2017, she allowed him to return to the house.  In August 2017, she again found prescription pills for opioids prescribed by PHAM.  In frustration, she reached out to A.K.'s mother and sister.  She stated that A.K.'s sister, T.K., is a nurse and soon thereafter called PHAM and asked him why he was prescribing opioids to A.K.  M.K. stated the last four months of 2017 were very difficult as A.K., a jeweler by trade, could not function at work.

> f.    On December 25, 2017, she stated that A.K. was so negatively affected by the opioids that he could barely open a Christmas present from his son.  M.K. recorded the incident and played the recording for us, at which time we observed A.K. in an almost catatonic state.  He had a hard time lifting his hands and was audibly slurring his words.

     g.    On that same day, M.K. called A.K.'s mother and sister to come over and take care of him.  His mom went into his car and found a backpack with ten different prescription bottles, all dated very close together and all prescribed by PHAM.  M.K. sent PHAM a text message and told him that if he continued to prescribe to A.K. that PHAM would be in very big trouble.  PHAM did not respond to her text.  A.K. went to PHAM after that and told her PHAM refused to prescribe anything to him.

     h.    M.K. stated A.K. has been seeing PHAM for at least 15 years and that his addiction has been an on-going cycle.  She thinks PHAM charged $100 per visit and accepts cash.  She believed A.K. went to PHAM at least once a week.

     i.    M.K. described A.K.'s relationship with PHAM as a friendship.  They would text message and talk on the cell phone on a regular basis.  At one point, PHAM was trying to get A.K. to help open a marijuana dispensary, but that plan did not materialize.

     j.    A.K.'s favorite pharmacy was Bristol Pharmacy.  There was an Asian pharmacist at the location, but M.K. does not know her name.  Based on my knowledge of the investigation and as corroborated by UCA's visit to PHAM's office, I believe the pharmacist is Jennifer N.

**Toll Analysis of PHAM's Text Messages**

    47.   Intelligence Analyst ("IA") Julie Banner and I conducted a toll analysis of PHAM's text messages from PHAM's telephone number, 949-xxx-7044.

48.  From July 6, 2018, to September 11, 2018, PHAM's telephone number was in contact with 24 telephone numbers that either were or are actively being investigated by the DEA and other law enforcement agencies.  The following two examples are of note, as they summarize the current criminal activity involved in each investigation:

a.  Based on a common call analysis, using toll records with a date range between 07/17/2018 and 08/30/2018, PHAM's telephone was in text message contact with GARCIA's telephone, 714-xxx-1255, approximately 31 times.

b.  PHAM's telephone number was in text message contact with phone number 909-xxx-1166 on 13 occasions from July 14, 2018, through August 23, 2018.  Per open source information, the subscriber of 909-xxx-1166 is J.H., an opioid addict and patient of PHAM's per CURES.  J.H.'s telephone number is in contact with 714-xxx-0454, which is believed to be used by K.E. I spoke with DEA SA Lindsay Burns, who informed me that K.E. is believed to be a Southern California courier and distributor of oxycodone and other narcotics per an active DEA investigation.

**Result of the First Search Warrant served for PHAM's Text Messages**

49.  On October 24, 2018, the Honorable Douglas F. McCormick, United States Magistrate Judge, signed a warrant to obtain historical text messages from PHAM's Verizon Wireless cellular telephone, 949-xxx-7044.  On the same day, I served the warrant on Verizon Wireless.

50.  On October 25, 2018, I downloaded the response packet from Verizon Wireless, which included text messages for the period of September 13, 2018, to October 24, 2018.  The following is a text message exchange between PHAM and GARCIA on October 5, 2018:

---------------Text Message for date/time - 2018-10-05T18:17:24.000Z---------------

Message Subject:

Source Address: 714xxx1255

Destinations: [949xxx7044]

Message Contents

Hi dr Pham,

I know [E.S.] came to you. Our pain management wants all of our accident records and its taking

forever. Im a week past due for scripts. Can you write for me please??


----------Text Message for date/time - 2018-10-05T18:17:34.000Z---------------

Message Subject:

Source Address: 714xxx1255

Destinations: [949xxx7044]

Message Contents

Erica garcia 4/27/84

Roxicodone 30mg 150

Hydrocodone 10mg 150

Adderall 30mg 90

Lexapro 20mg 30

Tramadol 50mg 120 - CAN WE DO LONG ACTING TRAMADOL PLS.

Thank you


---------------Text Message for date/time- 2018-10-

05T18:17:42.000Z---------------

Message Subject:

Source Address: 714xxx1255

Destinations: [949xxx7044]

Message Contents

 Please lmk ASAP


---------------Text Message for date/time - 2018-10-

05T18:51:26.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [714xxx1255]

Message Contents

 Ok it is ready


---------------Text Message for date/time - 2018-10-

05T19:57:21.000Z---------------

Message Subject:

Source Address: 714xxx1255

Destinations: [949xxx7044]

Message Contents

Thank you!!

51.  On November 9, 2018, I reviewed the CURES report for
PHAM and found that on October 5, 2018, the same date as the
text messages above between PHAM and GARCIA, GARCIA filled the
following four prescriptions written by PHAM:

| Drug Name | Form | Strength | Qty | Days Supply |
|---|---|---|---|---|
| AMPHETAMINE SALT COMBO | TAB | 30 MG | 90 | 30 |
| ACETAMINOPHEN-HYDROCODONE | | | | |
| BITARTRAT | TAB | 10/325 MG | 150 | 25 |
| OXYCODONE HCL | TAB | 30 MG | 150 | 25 |
| TRAMADOL HCL | TER | 100 MG | 30 | 30 |

And on October 8, 2018, GARCIA filled the following prescription
written by PHAM:

| Drug Name | Form | Strength | Qty | Days Supply |
|---|---|---|---|---|
| CARISOPRODOL | TAB | 350 MG | 90 | 30 |

52.  Based on my training, experience, and knowledge of
this investigation, I believe PHAM is exchanging text messages
with GARCIA.  I believe GARCIA is referring to her boyfriend,
E.S., who is also a patient of PHAM's.  Furthermore, I believe
that GARCIA asked PHAM to refill her prescriptions via text
message and told PHAM the quantity of pills that she wanted,
which are the numbers following the strength of the pills.
Based on the timeframe of the exchanged messages, including
PHAM's response that the prescriptions are "ready" within 35
minutes of GARCIA's requests, I believe PHAM likely wrote the

prescriptions without seeing GARCIA in person to provide an examination.

53. Based on my knowledge of this investigation and having spoken with other medical physicians and investigators, I believe that it is highly uncommon and suspect for a medical professional to be communicating with his or her patients via text message at the frequency with which PHAM and GARCIA have been communicating.

**Surveillance of PHAM on November 7, 2018**

54. IPD Detective Tim McDonald advised me of the following surveillance:

a. On November 7, 2018, at approximately 4:15 p.m., IPD Special Investigations Unit conducted surveillance at 15435 Jeffrey Rd #127, Irvine, California, **SUBJECT PREMISES 1,** and at 2940 Nau, Tustin, California, **SUBJECT PREMISES 2.**

b. At approximately 4:45 p.m., Detective J. Litchfield observed a teenage Asian male arrive at **SUBJECT PREMISES 2**, driving a 2009 white Mercedes Benz bearing California license plate 8BRN187. Per California DMV records, the vehicle is registered to Dzung Anh PHAM at 2940 Nau, Tustin, CA, 92782. The male parked in the driveway and used a garage code to enter the garage.

c. At approximately 6:25 p.m., Detective J. Litchfield observed a middle-aged Asian female arrive at **SUBJECT PREMISES 2**, driving a 2014 Lexus sedan bearing California license plate 7DYP667. Per California DMV records, the vehicle is registered to Dzung Anh PHAM at **SUBJECT PREMISES 2.** The

female parked in the driveway of the residence and used the garage code to enter the garage.

      d.    At approximately 7:10 p.m., the same female left **SUBJECT PREMISES 2** and drove to 15435 Jeffrey Rd #127, Irvine, California, **SUBJECT PREMISES 1**. She used a key to enter into the front doors of **SUBJECT PREMISES 1**.

      e.    Approximately 15 minutes later, the same female exited the front doors of **SUBJECT PREMISES 1**, locked the front doors using a key, and departed the area. Per open source information, PHAM's business at 15435 Jeffrey Rd #127 is closed on Wednesdays, which is the day of the week upon which this surveillance was conducted.

      f.    At approximately 8:07 p.m., Detective M. Annunziata observed PHAM exit the rear doors of **SUBJECT PREMISES 1**. The rear door had the number 127 above it indicating unit number 127. PHAM entered into a silver Lexus SUV bearing California license plate 5FJF828, **SUBJECT VEHICLE 1**. Per California DMV records, the vehicle is registered to Dzung A PHAM at 2940 Nau, Tustin Ranch, CA 92782. The Lexus SUV was parked in a parking stall directly behind PHAM's office building in the rear alley.

      g.    PHAM departed the area and drove to his residence, **SUBJECT PREMISES 2**. Pham parked the Lexus SUV along the curb line in front of the residence.

      h.    At approximately 9:00 p.m., Detective Litchfield observed PHAM enter into the garage and then enter into **SUBJECT PREMISES 2** through a door located within the garage.

       i.    At approximately 9:05 p.m., surveillance was concluded.

**Result of the Second Search Warrant served for PHAM's Text Messages**

55.  On November 13, 2018, United States Magistrate Judge McCormick signed another warrant to obtain historical text messages from PHAM's Verizon Wireless cellular telephone, 949-xxx-7044.  On the same day, I served the warrant on Verizon Wireless.

56.  On November 15, 2018, I downloaded the response packet from Verizon Wireless, which included text messages for the period of October 30, 2018, at 9:25 a.m. through November 13, 2018, at 10:44 p.m.

57.  The following is a text message exchange that occurred on  November 6, 2018, between PHAM's Verizon Wireless telephone number and telephone number, 949-xxx-6809, which based on an open source check, I believe belongs to D.N., a patient of PHAM's:

---------------Text Message for date/time - 2018-11-06T20:42:41.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

 Dr. Pham you wrote [G.P.]'s Norco for only quantity of 120 and I change it to an eight so it says 180 so he calls and confirms right now can you confirm that you wrote a prescription for 180

quantity Norco [G.P.]


---------------Text Message for date/time - 2018-11-

06T20:43:19.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  [G.P.] norco was for 180


---------------Text Message for date/time - 2018-11-

06T20:43:31.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message

  Contents They might call you


---------------Text Message for date/time - 2018-11-

06T20:43:45.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [949xxx6809]

Message Contents

  I do not agree to give [G.P.] 180 norco. He should be on 120

only

---------------Text Message for date/time - 2018-11-06T20:44:19.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  You have been giving him 180 the whole time


---------------Text Message for date/time - 2018-11-06T20:44:30.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  Some are for me

---------------Text Message for date/time - 2018-11-06T20:44:49.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  Can I bring these two back and get them for 180 please


---------------Text Message for date/time - 2018-11-06T20:45:34.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  It's always been 180


---------------Text Message for date/time - 2018-11-06T20:45:47.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  We truly need them


---------------Text Message for date/time - 2018-11-06T20:46:58.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  Can I I please come back and get scripts for 180


---------------Text Message for date/time - 2018-11-06T20:47:05.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [949xxx6809]

Message Contents

  Ok

---------------Text Message for date/time - 2018-11-06T20:47:29.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  Thank you. Will be back later. Taking mom to an eye appointment

---------------Text Message for date/time - 2018-11-06T20:49:43.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [949xxx6809]

Message Contents

  FYI, I will charge [G.P.] 140 for the two month supplies for norco.

---------------Text Message for date/time - 2018-11-06T20:50:19.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  Can we do $

---------------Text Message for date/time - 2018-11-

06T20:50:23.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents 120


---------------Text Message for date/time - 2018-11-

06T20:51:20.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [949xxx6809]

Message Contents

  Fine.


---------------Text Message for date/time - 2018-11-

06T20:51:59.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  I don't have any cash on me right now after paying your office

visit and the 60 I gave you can we

start that next time

---------------Text Message for date/time - 2018-11-06T20:52:27.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  I will come back at 3 o'clock to see you and just to let you know [G.P.] is one of the investors I have in your oil once you get a plan together


---------------Text Message for date/time - 2018-11-06T20:53:06.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [949xxx6809]

Message Contents

  Ok Good to know


---------------Text Message for date/time - 2018-11-06T20:54:00.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

  He is also the CEO of a public company

---------------Text Message for date/time - 2018-11-06T20:55:00.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

 Since we keep [G.P.] separate from your office staff do you want to just come out and meet me when I get to your office or do you want me to act like you need to come back and talk to you in your office for something


---------------Text Message for date/time - 2018-11-06T20:56:23.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

 They did see his prescriptions. They didn't photo copy his. They never have


---------------Text Message for date/time - 2018-11-06T20:57:07.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [949xxx6809]

Message Contents

 Text me whenever you are in the back of my office, door #127.

---------------Text Message for date/time - 2018-11-06T20:57:12.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

 You kept his file private in your personal affects


---------------Text Message for date/time - 2018-11-06T20:57:13.000Z---------------

Message Subject:

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

 Ok

    58.   On December 1, 2018, I reviewed the CURES report for
PHAM and found that on November 6, 2018, the same date as the
above text messages, G.P. filled the following two prescriptions
written by PHAM:

| Drug Name | Form | Strength | Qty |
|---|---|---|---|
| ALPRAZOLAM | TAB | 2 MG | 90 |
| HYDROCODONE BITARTRATE-ACETAMINOPHE | TAB | 325 MG-10 MG | 180 |


    59.   Based on my training, experience, and knowledge of
this investigation, I believe D.N. texted PHAM and asked PHAM to
write a prescription for 180 "norcos", or hydrocodone pills, for
another person by the name of G.P.  Furthermore, I believe that

PHAM knew at least some of the hydrocodone pills obtained from
PHAM's prescription would be used by someone other than G.P. --
*i.e.*, the user of telephone number 949-xxx-6809, as D.N.
indicated he was using some of G.P.'s prescriptions for himself.
D.N. also verified that PHAM would keep the file for G.P. in
PHAM's personal effects.

    60.  The following is a text message exchange that occurred
on November 7, 2018, between PHAM's Verizon Wireless telephone
number and telephone number 803-xxx-0091, which based on an open
source check, and information included in the text messages, I
believe belongs to C.K., a patient of PHAM's:

---------------Text Message for date/time - 2018-11-
07T02:04:47.000Z---------------

Message Subject:

Source Address: 803xxx0091

Destinations: [949xxx7044]

Message Contents

 I'm home now thank you for everything I am just super sleepy
and just feel little bloated that's all. Going back to sleep
now. Love you. Are you coming over tomorrow morning? Obviously I
can't have sex, but we don't have any groceries and I can make
$150 off of Dino's prescription For getting it for him, and I'm
almost out of my alprazolam I think, we can look at it tomorrow
if you don't mind. I'm kind of seeing blurry right now and
hoping this is coming out right. I love you

---------------Text Message for date/time - 2018-11-

07T02:24:19.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [803xxx0091]

Message Contents

 Ok Just rest. I will deposit 300 into your account tonight.


---------------Text Message for date/time - 2018-11-

07T02:32:11.000Z---------------

Message Subject:

Source Address: 803xxx0091

Destinations: [949xxx7044]

Message Contents

 I still wanted to spend time with you tomorrow we don't have to

have sex, or you could just go down on me! They went in through

my bellybutton and made small three incisions right above my

pubic bone so I'd love for someone to stimulate my clitoral

hood! I would also like to get Dino's prescription for him,

Because everything helps. Can I please have an orgasm tomorrow?

Or all of this shit would've been for nothing. Am I making

sense, I feel great just a little bloated.


---------------Text Message for date/time - 2018-11-

07T03:14:51.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [803xxx0091]

Message Contents

 Your request is my command

    61.  On December 1, 2018, I reviewed the CURES report for PHAM and found that on November 9, 2018, two days after the above text conversations, Dino B., the only patient identified with the first name of "Dino" in a two month CURES report for PHAM ranging from October to November 2018, filled the following prescription written by PHAM:

| Drug Name | Form | Strength | Qty |
|---|---|---|---|
| AMPHETAMINE SALT COMBO | TAB | 30 MG | 90 |

    62.  Based on my training, experience, and knowledge of this investigation, I believe in the above text messages that PHAM is writing prescriptions that he knows will be sold for cash when the user of telephone number 803-xxx-0091 writes, "I can make $150 off of Dino's prescription For getting it for him… I would also like to get Dino's prescription for him, Because everything helps."

    63.  Based on my knowledge of this investigation, having reviewed PHAM's text messages, and having conducted an open source search, I believe the user of telephone number, 803-XXX-0091, is PHAM's patient, C.K.  I also believe based on having read the text messages and comparing listed addresses on CURES that C.K. has a daughter with the initials of A.K, who is approximately 9 years old.  Having reviewed PHAM's CURES reports, I know that PHAM is also prescribing medications for both C.K. and her daughter, A.K.  Further troubling from a

review of the text messages is PHAM appears to be having an
intimate relationship with his patient, C.K., to whom PHAM is
also prescribing controlled substances.

64.   The following is a text message exchange that occurred
on or about November 9, 2018, between PHAM's Verizon Wireless
telephone number and telephone number, 931-xxx-2329, I believe
belongs to PHAM's patient T.C., discussed above, based on open
source records and my knowledge of this investigation:


---------------Text Message for date/time - 2018-11-
09T23:54:56.000Z---------------
Message Subject:
Source Address: 949xxx7044
Destinations: [931xxx2329]
Message Contents
 Hi [patient's name] One of my patient just told me that the
thousand oak shooter, ian david long, had my prescription
bottles that belong to some else. I never saw Mr. Long before,
so i dont know the implication of
this information.


---------------Text Message for date/time - 2018-11-
10T00:01:06.000Z---------------
Message Subject:
Source Address: 931xxx2329
Destinations: [949xxx7044]
Message Contents

Ill get [my wife] on it, if its not his prescriptions you are
clear ok, dont worry...do you know who the person was that had
the original script? But thats not on you, if i give my meds to
some crazy person its on me, not you, you have no control over
what happened after a patient leaves your office ok..but i will
ask [my wife] to clarify.

65. Based on my training, experience, knowledge of this
investigation, and having reviewed PHAM's text messages, I
believe PHAM is texting a patient of his to express concern that
Ian David Long, the individual who shot and killed twelve people
in Thousand Oaks, California, on November 7, 2018, had in his
possession prescriptions written by PHAM.  Though it is unclear
for whom the prescriptions were written, PHAM's text message
reveals the possibility that PHAM knew his prescriptions could
have been diverted and used by other individuals.

**Summary of the Troublesome Findings within PHAM's Text Messages**

66. After reviewing the results of the first and second
search warrants for PHAM's text messages, I observed the
following red flags:

a. From September 13, 2018, to October 2, 2018, over
100 different patients texted PHAM to refill their
prescriptions, often times dictating to PHAM what they wanted,
to include the type and quantity of drug.  Per CURES, at least
84 of those patients had their prescriptions filled on the same
day or within the next two days of their text messages.  The
drugs requested include, but are not limited to, adderall,
oxycodone, tramadol, suboxone, norco, soma, alprazolam, and

hydrocodone bitartrate-acetaminophen.

      b.    Several of PHAM's patients sent PHAM texts requesting "Roxy's," which I know is a commonly used street slang for Roxicodone, a brand name for oxycodone.  One text in particular, sent by patient S.C. on November 5, 2018, states, "hi dr pham, can you please have my script ready for pick up...90 roxy, and 60 xanax, thank you...[patient's first name]." On November 9, 2018, patient S.C. filled PHAM's prescription for alprazolam 2-mg quantity 60 and for Oxycodone HCL 30-mg quantity 90.

      c.    These are a summary of the text messages and do not purport to identify all of the illicit activities suggested within the text messages.

**Tracking of PHAM's Lexus SUV, SUBJECT VEHICLE 1**

    67.  On December 6, 2018, IPD Detective McDonald informed me from November 14, 2018, through December 6, 2018, he has continuously reviewed records produced from the GPS tracking device placed on PHAM's silver Lexus SUV, **SUBJECT VEHICLE 1**.  Detective McDonald informed me that the records reveal that **SUBJECT VEHICLE 1** has consistently been parked either in the driveway of or on the front curb line of 2940 Nau Avenue, Tustin, California, **SUBJECT PREMISES 2**, which had been determined to be PHAM's primary residence.  The tracking device information continued to confirm that **SUBJECT VEHICLE 1,** believed to be PHAM's primary vehicle, is also consistently parked at 15435 Jeffrey Road, Unit 127, Irvine, California, **SUBJECT PREMISES 1.**

**Surveillance of GARCIA, SUBJECT PREMISES 3 and SUBJECT VEHICLE 2**

68. IPD Detective McDonald informed me of the following surveillances and observations:

a. On November 29, 2018, at approximately 10:00 a.m., IPD detectives conducted surveillance at 141 Port, Irvine, **SUBJECT PREMISES 3.**

b. At approximately 10:40 a.m., Detective T. McDonald observed GARCIA driving her white Jeep with California license plate of 7MOK843, **SUBJECT VEHICLE 2,** near her residence, **SUBJECT PREMISES 3**. IPD detectives continued to follow GARCIA to the parking structure of 19510 Jamboree Rd, Irvine. GARCIA exited her vehicle and entered into an unknown building in the area.

c. At approximately 3:00 p.m., Detective T. McDonald observed GARCIA enter back into **SUBJECT VEHICLE 2** and IPD detectives followed her until she arrived back at 141 Port, Irvine, **SUBJECT PREMISES 3**. Detective D. Tran observed GARCIA exit her vehicle and enter into the front doors of the residence, **SUBJECT PREMISES 3.**

69. It should be noted that from the dates of November 14, 2018, to December 10, 2018, the white Jeep with a California license plate of 7MOK843, **SUBJECT VEHICLE 2,** shows via GPS tracking data that it is parked in front of 141 Port, Irvine, **SUBJECT PREMISES 3,** each and every night.

70. I also reviewed and compared PHAM's CURES reports for dates GARCIA and E.S. filled PHAM's prescriptions and the tracker information for **SUBJECT VEHICLE 2.** Per tracker records,

on November 19, 2018, **SUBJECT VEHICLE 2** was located in the vicinity of PHAM's office, **SUBJECT PREMISES 1**, for approximately 18 minutes.  On November 20, 2018, E.S. filled a prescription from PHAM for the following:

| | | |
|---|---|---|
| TRAMADOL HCL | TAB 50 MG | 180 |
| OXYCODONE HCL | TAB 30 MG | 150 |
| CARISOPRODOL | TAB 350 MG | 90 |
| ACETAMINOPHEN-HYDROCODONE BITARTRAT | TAB 325 MG-10 MG | 150 |
| DEXTROAMPH SACC-AMPH ASP-DEXTROAM S | TAB 30 MG | 90 |

71.  Per tracker records, on December 3, 2018, **SUBJECT VEHICLE 2** parked in the vicinity of PHAM's office, **SUBJECT PREMISES 1**, for approximately 31 minutes.  On the same day, GARCIA filled a prescription from PHAM for the following:

| | | |
|---|---|---|
| CARISOPRODOL | TAB 350 MG | 90 |
| TRAMADOL HCL | TAB 100 MG | 30 |
| ACETAMINOPHEN-HYDROCODONE BITARTRAT | TAB 325 MG-10 MG | 150 |
| OXYCODONE HCL | TAB 30 MG | 150 |
| DEXTROAMPH SACC-AMPH ASP-DEXTROAM S | TAB 30 MG | 90 |

**Financial Analysis of PHAM's Banking Activities**

72.  On November 8, 2018, DEA Senior Financial Investigator Dennis Packer provided me with the below information regarding the banking activities of PHAM.

a.    PHAM and his wife have nine bank accounts between them at East West Bank ("EWB") and PHAM has one account at Wells Fargo Bank ("WFB").  On some of the bank accounts, PHAM listed **Subject Premises 1** as his business address and **Subject Premises 2** as the address of his residence.  Between 2013 and September 2018, PHAM, dba IRVINE VILLAGE URGENT CARE, deposited over $5 million, the bulk of which was cash deposits, primarily in

71

accounts at EWB, but also at WFB from 2016 through 2018. PHAM
sometimes structured his cash deposits to avoid the currency
transaction reporting requirement, and typically would withdraw
or transfer his funds soon after depositing them.

      b.    PHAM also maintained a business banking account
in which the majority of the deposits were checks from various
health care providers, which PHAM used the funds to pay personal
expenses directly from the account. PHAM also had a merchant
account for his business in which PHAM deposited approximately
$1.7 million from 2013 through 2018.

    73.  Per a review of Registrant Information Consolidated
System, in February of 2018, PHAM applied to the Center for
Substance Abuse Treatment to increase his opioid addiction
treatment to the maximum of 275 patients from 100 patients.

    74.  I reviewed CURES reports for four days ranging from
the months of January through June 2018. The following is what
I discovered after reviewing CURES:

      a.    On January 31, 2018, approximately 21 patients of
PHAM filled prescriptions, one of which was a prescription for
buprenorphine.

      b.    On March 13, 2018, approximately 40 patients of
PHAM filled prescriptions, three of which were prescriptions for
buprenorphine.

      c.    On April 26, 2018, approximately 45 patients of
PHAM filled prescriptions, eight of which were prescriptions for
buprenorphine.

d. On June 5, 2018, approximately 55 patients of PHAM filled prescriptions, nine of which were prescriptions for buprenorphine.

75. I know based on my knowledge of this investigation, reviewing PHAM's text messages and reviewing UCA reports that PHAM charges anywhere between $100 and $150 for prescriptions and/or office visits. Based on the increase in the number of prescriptions being filled from January to June 2018 to include buprenorphine prescriptions, I believe PHAM requested the increase of patients from CSAT in order to make more money from patients either requesting prescriptions or visiting his doctor's office.

**Overdose Deaths & DUI Investigations Involving PHAM**

76. Based on records I received from the Orange County Sheriff-Coroner Division, I have learned of five victims (A.M.B-C., M.B.F., S.L.S., B.W.T., and S.C.V.) who have overdosed and died who were also receiving and filling prescriptions from PHAM from 2014 to 2017.

a. One victim, a 46 year old male, B.W.T., overdosed from acute alprazolam, hydrocodone, trazodone, and hydroxyzine intoxication in November 2014.

b. One victim, a 21 year old male, S.L.S., overdosed from an acute polydrug intoxication of heroin, buprenorphine and alprazolam on August 30, 2015. Per CURES, S.L.S. filled the following prescriptions from PHAM:

Alprazolam 2 mg, quantity 30, filled on 8/17/15

Suboxone, 8 mg-2 mg, quantity 90, filled on 8/19/15

Zubsolv 5.7 mg-1.4 mg, quantity 15, filled on 8/19/15

Alprazolam 2 mg, quantity 60, filled on 8/28/15

In the report, the victim's mother referred to PHAM as "Dr. Feel-good."

77. On November 3, 2018, at approximately 8:00 a.m., S.T.S., a patient of PHAM's, struck and killed a Costa Mesa Fire and Rescue Captain. I know having spoken with OCSD Investigator Shane Stewart that S.T.S. told investigators in his post-arrest interview that S.T.S. was on medications prescribed by PHAM. Investigator Stewart also informed me that in S.T.S.'s vehicle were several prescription bottles for S.T.S. that were prescribed by PHAM. In reviewing PHAM's CURES report, I observed that on or about October 31, 2018, S.T.S. filled the following prescriptions from PHAM:

| LORAZEPAM | TAB 2 MG | 60 |
| AMPHETAMINE SALT COMBO | TAB 30 MG | 60 |
| SUBOXONE | FIL 8 MG-2 MG | 90 |

78. Furthermore, in a review of search warrant returns of PHAM's text messages, I observed a text message from D.L. that was sent to PHAM on September 24, 2018. In the text message, D.L. wrote: "Hi doctor Pham it's [D.L.]. U told to find another doctor because my brother past away but I can't get any or find any doctors that'll give me a benzo...since he died I have really bad attacks I never knew a pannick attack till that happened. My mom has to give me a Ativan sometimes...I was gonna ask you if you can please help me? I don't need even half of what u used to you used to give me...can I please start seeing

you again??"

      a.    Based my training, experience, and knowledge of this investigation, I believe D.L. is texting PHAM to obtain benzodiazepines. I also believe D.L. is telling PHAM that other doctors will not prescribe to D.L. what PHAM had prescribed to D.L., and that PHAM turned D.L. away as a patient after the death of D.L.'s brother.

      b.    I reviewed CURES reports and observed that PHAM prescribed to both D.L. and to R.L., who is similar in age and shared the same address as D.L. Based on an open source search, I believe R.L. died on or about March 9, 2018, and R.L. and D.L. are brothers. In reviewing PHAM's CURES report, I observed that on or about March 5, 2018, R.L. filled the following prescriptions from PHAM:

| LORAZEPAM | TAB 1 MG | 28 |
| DIAZEPAM | TAB 2 MG | 28 |

      c.    I have since reached out to the Orange County Sheriff Coroner Division to inquire about the death of R.L.

## IV. ADDITIONAL PROCEDURES REGARDING REQUESTED PATIENT INFORMATION

    79.    As noted above, this investigation has revealed evidence that PHAM has been prescribing controlled substances outside the usual course of professional practice and without a legitimate medical purpose at **SUBJECT PREMISES 1** from at least 2014 to the present, and that evidence of these offenses will be found at the **SUBJECT PREMISES.** To minimize disruption to any legitimate medical needs of patients, the seizing agents will implement the procedures set forth in Attachment C, which is

incorporated herein by reference.  The procedures provide that, upon written request from a patient, the government will provide to such patient within 48 hours (excluding weekends and holidays) a copy of any medical treatment information it has seized regarding that patient.

### V. ADDITIONAL PROBABLE CAUSE FOR ITEMS TO BE SEIZED

80.  Based on my training, education, experience, and discussions with other law enforcement officers, I know that:

a.    Persons involved in drug trafficking, including medical professionals, often keep controlled substances, proceeds of drug sales, records of drug transactions, and other records within their residences and businesses or within ready access, *i.e.,* in their storage areas and vehicles, and conceal such items from law enforcement authorities.  The drugs/prescriptions may be sold but documentary records and ledgers remain.  Specifically, those that divert and distribute pharmaceutical pills, such as GARCIA, often reside at and store or maintain the following evidence at their residence:

i.    Controlled substances, namely prescription drugs;

ii.    Paraphernalia for packaging, processing, cutting, weighing, and distributing controlled substances, such as and prescription bottles;

iii.    Books, records, receipts, notes, ledgers, and other papers relating to the manufacture, distribution, and possession with intent to distribute controlled substances;

          iv.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture, distribution, and possession with intent to distribute controlled substances and personal property tending to show the existence and/or location of other stored pharmaceutical pills and other controlled substance, including, but not limited to, storage locker receipts, maps, safety deposit keys and corresponding records, and money-counting machines;

          v.     Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and prepaid debit cards;

          vi.     Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

          vii.     Photographs, negatives, video tapes, films, undeveloped film, electronic storage devices and the contents therein, depicting the subjects of the investigation and their criminal associates, their assets and/or controlled substances;

          viii.     Items of personal property that tend to identify the person(s) in residence, and the occupancy, control, or ownership of the subject premises, such as canceled mail, deeds, leases, rental agreements, photographs, personal

telephone books, diaries, utility and telephone bills,
statements, identification documents, and keys;

         ix.     Devices used to communicate with other
individuals involved in the transportation, distribution, and
possession with intent to distribute pharmaceutical pills and
other controlled substances, including cellular telephones,
mobile telephones, phone answering machines, telephone answering
machine tapes, beepers or pagers, and devices used to conduct
counter-surveillance against law enforcement, such as radio
scanners, police radios, surveillance cameras and monitors,
anti-bugging devices and devices used to detect the presence of
wiretaps, recording devices or transmitters, and/or receipts or
literature describing the same; and

         x.     Assigned telephone numbers for
telephone and cellular telephones, found at the **Subject
Premises,** along with telephone toll records, papers, notebooks,
and other items, documenting the manufacture, distribution, or
possession with intent to distribute counterfeit pharmaceutical
pills and other controlled substances, and communications among
co-conspirators.  Based upon my training and experience, as well
as the collective knowledge and experience of other assisting
agents, I am aware that it is a common practice for individuals
who traffic in illicit drugs to keep records, proceeds from drug
transactions, and other evidence at their residences and in
their vehicles.

     b.   Persons involved in drug trafficking, including
medical professionals, often purchase real estate, vehicles,

precious metals, or other expensive items using drug trafficking proceeds and will maintain records, documents, or materials evidencing such purchases in their offices, residences, or vehicles.  For example, during an investigation in 2008, DEA agents seized documents evidencing financial securities and vehicle and real estate purchases made by a medical professional who was charged with issuing unlawful prescriptions for cash. The documents were seized from the defendant's residence and vehicle.

        c.    Persons involved in drug trafficking, including medical professionals, often maintain large amounts of currency in their residences and businesses, safe deposit boxes, and storage areas in order to finance their ongoing illegal activities and other businesses, as well as using currency to pay bills, to acquire assets, and to make other purchases.  In addition, as set forth above, PHAM generally exchanges prescriptions for cash and frequently withdraws cash from bank accounts, making it even more probable that PHAM maintains currency as described in this paragraph.

        d.    It is common knowledge within the law enforcement community that drug transaction records, books, account ledgers, payments, notes, and other evidence of financial transactions relating to obtaining, transferring, and spending substantial sums of money arising from drug trafficking activities are often maintained at or in residences, businesses, safe deposit boxes, vehicles, and storage areas of drug-traffickers.  For example, in 2009 during an investigation involving a drug distribution

conspiracy at a medical clinic, notebooks containing records of drugs prescribed and money owed (commonly referred to in narcotics investigations as "pay owe sheets") were seized from the clinic.

      e.    Persons involved in drug trafficking, including medical professionals, often retain personal and business notes, letters, and correspondence relating to their prescription orders at their residences and businesses, as well as in vehicles, safe deposit boxes, and storage areas.

      f.    Persons involved in drug trafficking, including medical professionals, generally retain telephone, address, and appointment books identifying additional individuals, including "patients," involved in illegal trafficking of controlled substances.  Additionally, these persons generally retain documents or records which establish control of their premises and registered vehicles, including utility bills, cancelled checks, envelopes, deeds, leases, titles, and vehicle registrations.

      g.    Persons involved in drug trafficking, including medical professionals, commonly use telecommunication devices to further their illegal operations and communicate with associates, including telephones, mobile telephones, cellular telephones, and digital paging devices.

      h.    Persons involved in drug trafficking, including medical professionals, often have firearms to protect the proceeds of their drug trafficking.  On December 13, 2018, Alcohol, Tobacco, Firearms, and Explosives Special Agent James

Sanders provided me with a California report of firearms registered to PHAM and PHAM has more than twelve firearms registered under his name.

       i.   Doctors routinely maintain patient files in their offices where they see patients.  I also know that under California State Law, doctors are required to keep records of the controlled substance prescriptions they write and the controlled substances they dispense, and that doctors routinely keep these records at their offices where they see patients.  I also know that doctors keep these types of patient records and controlled substance records in computers or in other electronic forms.  I also know based on my training and experience that doctors transport their patient records and documents in their vehicles to other locations, including their residences, to review and update these records.

### VI.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[3]

    81.  As discussed herein, based on my training and experience, I believe that digital devices will be found during the search of the **SUBJECT PREMISES.**  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

digital devices, I know that the following electronic evidence, *inter alia*, is often retrievable from digital devices:

      **a.** Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      **b.** Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

82.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

   b.     Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

   83.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

   a.     Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

   b.     In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

       c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PHAM's and/or GARCIA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of PHAM's and/or GARCIA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

84. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

85.   For all the reasons described above, there is
probable cause to believe that the **SUBJECT PREMISES** described in
Attachments A-1 through A-5 contain the fruits,
instrumentalities, and evidence of manufacturing and
distributing controlled substances, and indicia of the proceeds
from the sale of controlled substances, as described in
Attachment B, constituting the fruits, instrumentalities, and
evidence of violations of 21 U.S.C. § 841(a)(1)(Distribution and
Possession with Intent to Distribute a Controlled Substance).


_____
Lindsey Bellomy
SPECIAL AGENT


Subscribed to and sworn before me
this _____ day of December, 2018.


_____
THE HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A-1</u>

**SUBJECT PREMISES 1**: 15435 Jeffrey Road, Unit 127, Irvine, California 92618, the medical office of Dzung PHAM, D.O., further described as a single story commercial complex located on the northwest corner of Jeffrey Road and Irvine Center Drive. The building is grey in color with white trim and a grey-painted overhang over the walkway. The numerals "15435" are posted on east side of the building approximately 15' from the ground. They are white numerals, approximately 8" tall, against a green-painted, oval shaped piece of wood. The numerals "127" are posted to the left of the front entrance, about 5' from the ground, are white in color and approximately 5" tall. The door is a white-painted frame with two columns of five, 12" x 12" square-shaped piece of glass. The words "Dr. Pham" are found posted on the overhang outside the walkway to the front entrance. The letters are white and approximately 9"-12" tall, posted against the grey-painted overhang, below the white-painted trim. There are glass windows above and to the right and left sides of the front door.



**ATTACHMENT A-2**

**SUBJECT PREMISES 2**: 2940 Nau Avenue, Tustin, California, 92782, the residence of Dzung PHAM, further described as a two-story, single family residence.  It is located on the north east corner of Nau and Maynard Avenues and is comprised of beige stucco, brown trim, and a brown tile roof.  The front door is brown in color and faces west toward Nau.  There is a concrete driveway that leads to two separate garage doors both of which are brown in color.  There is a concrete stepped walkway that leads to the front door.  The number "2940" is located approximately 6 feet off the ground just to the right of the single car garage door. The numbers are black in color with a white background.  Also, there is a black in color mailbox next to the driveway with the number "2940" on the front.



## <u>ATTACHMENT A-3</u>

**SUBJECT PREMISES 3:** 141 Port, Irvine, California 92618, the residence of Erica R. GARCIA and E.S., further described as a two-story, single family residence.  It is located on the north east corner of Port and Compass and is comprised of light yellow stucco, white or light blue paneling, with a gray shingle roof.  The front door is dark gray and faces south toward Port.  There is a concrete walkway that leads from the sidewalk straight to the front door.  There is also a brown concrete block wall to the east of the front door that appears to surround the backyard and can be seen from the front of the house.  The numbers "141" are located above the front door and are white in color with a dark background.



## **ATTACHMENT A-4**

**SUBJECT VEHICLE 2:** A 2004 Lexus sport utility vehicle, silver in color, bearing California license plate 5FJF828, with a listed registered owner of Dzung A PHAM at 2940 Nau, Tustin Ranch, California, and believed to be driven by Dzung PHAM.

**ATTACHMENT A-5**

**SUBJECT VEHICLE 1:** A 2015 Jeep Cherokee sport utility vehicle, white in color, bearing California license plate 7MOK843, with a listed registered owner of G.Z. on Imperial Highway, Norwalk, California, and believed to be driven by Erica GARCIA.

**ATTACHMENT B**

I.  <u>**ITEMS TO BE SEIZED**</u>

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1), those violations involving Dzung Ahn PHAM, D.O., and occurring between January 1, 2014, and the present, namely:

   a.  United States currency in an amount exceeding $500.

   b.  Controlled substances, including but not limited to, oxycodone, hydrocodone, alprazolam, amphetamine salts, carisoprodol, tramadol, and buprenorphine.

   c.  Documents that refer or relate to times when controlled substances, including but not limited to, oxycodone, hydrocodone, alprazolam, amphetamine salts, carisoprodol, tramadol, and buprenorphine, were prescribed, customer lists, appointment books, pharmacy information, correspondence, notations, logs, receipts, journals, books, and records.

   d.  Medical records, patient files, sign-in sheets, charts, billing information, payment records, and identification documents that refer to any of the following patients: <u>**PHAM's patients, identified by law enforcement agents and investigators, medical board personnel, and/or Dr. Munzing, receiving large quantities and/or combinations of commonly abused and diverted drugs, and/or patients residing at the same address receiving combinations of commonly abused and diverted drugs, and/or patients who have sought prescriptions from PHAM**</u>

**via text message, and/or patients identified in Orange County Sheriff-Coroner's reports:**

| | |
|---|---|
| A.A.; DOB: 10/15/1981 | R.J.; DOB: 11/23/1943 |
| B.A.; DOB: 12/27/1988 | B.A.K.; DOB: 8/21/1988 |
| D.A.; DOB: 7/22/1960 | A.K.; DOB: 8/10/1979 |
| E.A.; DOB: 1/3/1979 | B.K.; DOB: 11/20/1973 |
| E.A.; DOB: 4/11/1974 | T.K.; DOB: 4/19/1986 |
| J.A.; DOB: 1/1/1958 | T.K.J.; DOB: 12/5/1981 |
| C.A.; DOB: 1/4/1965 | A.K.; DOB: 1/26/2009 |
| J.A.; DOB: 5/1/1975 | C.K.; DOB: 3/31/1982 |
| M.B.; DOB: 2/2/1970 | B.K.; DOB: 01/18/1986 |
| M.B.; DOB: 12/29/1977 | D.K.; DOB: 07/26/1975 |
| S.B.; DOB: 1/5/1981 | D.K.; DOB: 12/13/1978 |
| R.B.; DOB: 8/2/1967 | D.L.; DOB: 10/12/1971 |
| T.B.; DOB: 2/27/1979 | E.L.; DOB: 1/15/1973 |
| B.B.; DOB: 9/21/1979 | N.L.; DOB: 7/17/1976 |
| L.B.; DOB: 2/26/1985 | T.L.; DOB: 6/8/1970 |
| M.B.; DOB: 4/22/1982 | D.L.; DOB: 1/9/1989 |
| L.B.; DOB: 1/22/1980 | R.L.; DOB: 9/8/1991 |
| P.B.; DOB: 10/17/1944 | D.L.; DOB: 11/9/1958 |
| A.M.B-C; DOB: 3/11/1989 | J.L.; DOB: 4/27/1989 |
| D.B.; DOB: 5/30/1982 | T.L.; DOB: 10/27/1978 |
| L.B.; DOB: 5/1/1966 | G.M.; DOB: 3/29/1983 |
| M.B.; DOB: 4/30/1979 | J.M.; DOB: 9/17/1983 |
| T.B.; DOB: 6/9/1956 | S.M.; DOB: 4/5/1970 |
| D.B.; DOB: 5/21/1976 | L.M.; DOB: 7/24/1947 |

| | |
|---|---|
| J.B.; DOB: 8/10/1979 | M.M.; DOB: 3/22/1973 |
| M.B.; DOB: 11/30/1984 | K.M.; DOB: 1/29/1979 |
| A.C.I; DOB: 10/16/1993 | J.M.M.; DOB: 12/29/1980 |
| B.R.C.; DOB: 1/28/1982 | S.M.; DOB: 8/18/1970 |
| C.C.; DOB: 8/16/1979 | W.M.; DOB: 01/17/1985 |
| J.M.C.; DOB: 3/23/1976 | E.A.M.; DOB: 9/3/1972 |
| L.C.; DOB: 9/4/1982 | R.M.; DOB: 9/10/1968 |
| Z.C.; DOB: 6/4/1979 | N.M.; DOB: 2/15/1982 |
| K.C.; DOB: 12/15/1981 | M.N.; DOB: 2/22/1989 |
| S.C.; DOB: 10/2/1982 | P.N.; DOB: 05/24/1981 |
| S.C.; DOB: 6/19/1975 | J.N.; DOB: 12/1/1963 |
| J.C.; DOB: 8/22/1966 | A.N.; DOB: 9/12/1981 |
| T.C.; DOB: 5/5/1970 | J.N.; DOB: 12/27/1976 |
| J.L.C.; DOB: 12/24/1980 | S.N.; DOB: 1/4/1963 |
| C.C.; DOB: 7/16/1974 | D.N.; DOB: 06/25/1970 |
| R.A.C.; DOB: 8/20/1987 | R.P.; DOB: 8/5/1956 |
| S.C.; DOB: 9/14/1984 | R.P.; DOB: 9/5/1984 |
| J.D.; DOB: 7/18/1980 | D.P.; DOB: 1/18/1970 |
| W.D.; DOB: 12/24/1977 | R.P.; DOB: 3/9/1982 |
| S.D.; DOB: 9/1/1986 | B.P.; DOB: 6/15/1978 |
| D.R.D.; DOB: 8/6/1975 | L.P.; DOB: 01/10/1962 |
| R.D.; DOB: 5/12/1980 | M.P.; DOB: 11/14/1974 |
| K.D.; DOB: 6/28/1977 | W.P.; DOB: 11/28/1958 |
| C.D.; DOB: 2/19/1984 | C.P.; DOB: 8/12/1992 |
| L.D.; DOB: 5/29/1967 | G.P.; DOB: 1/19/1952 |
| J.D.; DOB: 10/3/1965 | B.P.; DOB: 8/5/1982 |

| | |
|---|---|
| P.D.; DOB: 5/23/1980 | O.G.R.; DOB: 10/14/1981 |
| R.D.; DOB: 1/29/1973 | T.R.; DOB: 1/13/1993 |
| A.E.; DOB: 7/19/1974 | K.R.; DOB: 8/23/1970 |
| J.E.; DOB: 3/21/1971 | B.R.; DOB: 12/25/1982 |
| K.E.; DOB: 7/15/1950 | H.R.; DOB: 5/15/1989 |
| T.E.; DOB: 10/9/1974 | C.R.; DOB: 11/18/1964 |
| A.E.; DOB: 8/30/1983 | R.R.; DOB: 6/25/1984 |
| V.F.; DOB: 7/1/1987 | J.P.S.; DOB: 8/17/1971 |
| M.F.; DOB: 2/15/1989 | S.T.S; DOB: 8/31/1993 |
| S.F.; DOB: 10/2/1975 | M.S.; DOB: 05/13/1971 |
| S.F.; DOB: 12/13/1957 | C.S.; DOB: 4/15/1977 |
| J.F.; DOB: 6/10/1976 | K.S.; DOB: 5/6/1974 |
| K.F.; DOB: 5/7/1983 | N.S.; DOB: 01/18/1952 |
| M.B.F.; DOB: 6/4/1989 | S.S.; DOB: 7/27/1976 |
| M.G.; DOB: 7/1/1971 | R.S.; DOB: 4/30/2988 |
| E.G.; DOB: 4/27/1984 | E.S.; DOB: 07/29/1987 |
| N.G.; DOB: 06/02/1979 | E.S.; DOB: 5/3/1982 |
| P.G.; DOB: 08/07/1982 | J.E.; DOB: 03/20/1985 |
| C.G.; DOB: 03/10/1981 | J.S.; DOB: 12/27/1958 |
| J.G.; DOB: 8/17/1973 | C.S.; DOB: 10/16/1996 |
| K.G.; DOB: 9/19/1980 | S.L.S.; DOB: 3/19/1994 |
| G.G.; DOB: 9/10/1977 | L.T.; DOB: 6/7/1994 |
| J.H.; DOB: 9/22/1974 | S.T.; DOB: 7/21/1998 |
| K.H.; DOB: 10/29/1976 | B.W.T.; DOB: 4/2/1968 |
| S.H.; DOB: 10/09/1969 | J.T.; DOB: 3/16/1991 |
| S.H.; DOB: 8/26/1974 | E.V.; DOB: 4/2/1983 |

| | |
|---|---|
| J.H.; DOB: 11/9/1975 | R.V.; DOB: 1/4/1980 |
| C.H.; DOB: 3/16/1983 | S.C.V.; 9/15/1966 |
| N.H.; DOB: 5/18/1993 | J.V.; DOB: 6/27/1979 |
| C.H.; DOB: 2/18/1986 | G.V.; DOB: 12/5/1977 |
| A.H.; DOB: 10/8/1972 | E.V.; DOB: 1/7/1985 |
| T.H.; DOB: 10/16/1980 | K.W.; DOB: 12/23/1974 |
| H.A.J.; DOB: 3/24/1965 | E.W.; DOB: 4/5/1989 |
| M.J.; DOB: 5/12/1963 | D.W.; DOB: 2/29/1952 |
| J.J.; DOB: 4/19/1987 | J.W.; DOB: 9/5/1979 |
| J.J.; DOB: 9/22/1970 | W.Z.; DOB: 8/20/1979 |

        e.    Personal telephone and address books and
listings, letters, cables, telegrams, emails, personal notes,
and other items that refer or relate to the prescription of any
controlled substance.

        f.    Financial records showing payment, receipt,
concealment, transfer, or movement of money relating to the
prescription of any controlled substance.

        g.    Documents, including but not limited to emails,
check registers, cancelled checks, deposit items, financial
instruments, facsimile transmissions, or ledgers that refer to
any person to whom PHAM prescribed a controlled substance.

        h.    Memoranda concerning, correspondence with, and/or
letters to or from any insurance company that refer to any
person to whom PHAM prescribed a controlled substance.

        i.    Financial instruments purchased with currency in

x

the sum of $500 or more.

   j. Precious metals valued at $500 or more.

   k. Records, documents, titles, mortgage paperwork, and deeds reflecting the purchase, rental, or lease of any real estate and vehicles, such as a car, truck, motorcycle, boat, plane, or RV.

   l. Not more than twenty (20) indicia of occupancy, residency, rental, or ownership of the **SUBJECT PREMISES**, identified in attachments A-1 through A-5, including but not limited to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, and escrow documents.

   m. Keys to show ownership of storage facilities, businesses, locked containers, cabinets, safes, conveyances, and/or other residences.

   n. As used herein, the terms amphetamine salts, alprazolam, oxycodone, hydrocodone, and buprenorphine include all medications containing the drug, including those marketed under brand names.

   o. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Target Offense, and forensic copies thereof.

  2. With respect to any digital devices used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the device;

g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h. records of or information about Internet Protocol addresses used by the device;

i. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

3.    As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

4.    As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; peripheral input/output devices, such
as keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices,
such as modems, routers, cables, and connections; storage media,
such as hard disk drives, floppy disks, memory cards, optical
disks, and magnetic tapes used to store digital data (excluding
analog tapes such as VHS); and security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

86.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or

seize and transport the device(s) to an appropriate law
enforcement laboratory or similar facility to be searched at
that location.  The search team shall complete the search as
soon as is practicable but not to exceed 120 days from the date
of execution of the warrant.  The government will not search the
digital device(s) beyond this 120-day period without first
obtaining an extension of time order from the Court.

      b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

      i.    The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

      ii.    The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

      iii.    The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

      c.    If the search team, while searching a digital
device, encounters immediately apparent contraband or other

xiv

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

       g.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized

by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

      h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

87.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

      b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

        f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

        g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

88.  During the execution of this search warrant, law enforcement is permitted to: (1) depress PHAM's and/or GARCIA's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of PHAM's and/or GARCIA's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

89.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## ATTACHMENT C

The following procedures will be followed in order to minimize disruption to the legitimate medical needs of patients:

A patient whose medical information has been seized pursuant to this search warrant may request that a copy of that seized information be returned to the patient.  These requests must be in writing and shall be submitted to Special Agent Lindsey Bellomy, Drug Enforcement Administration, 1900 East First Street, Santa Ana, California 92705.  Requests may also be faxed to (714) 647-4969 or emailed to Lindsey.M.Bellomy@usdoj.gov.  The government must provide to the patient making the request a copy of any medical information it has regarding the patient within 48 hours (excluding weekends and holidays) of receiving the request.

i

AO 93 (Rev. 11/13) Search and Seizure Warrant (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 2940 Nau Avenue Tustin, California 92782 | ) ) ) |

Case No.    8:18-MJ-00648

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Central _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before    14 days from the date of its
issuance _____ *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    the U.S. Magistrate Judge on duty at the time of the
return through a filing with the Clerk's Office    .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    12/17/2018 _____              _____
*Judge's signature*

City and state:    Santa Ana, CA _____       Honorable Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: B. Sagel x3598

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|
| |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-2

**SUBJECT PREMISES 2**: 2940 Nau Avenue, Tustin, California, 92782, the residence of Dzung PHAM, further described as a two-story, single family residence.  It is located on the north east corner of Nau and Maynard Avenues and is comprised of beige stucco, brown trim, and a brown tile roof.  The front door is brown in color and faces west toward Nau.  There is a concrete driveway that leads to two separate garage doors both of which are brown in color.  There is a concrete stepped walkway that leads to the front door.  The number "2940" is located approximately 6 feet off the ground just to the right of the single car garage door. The numbers are black in color with a white background.  Also, there is a black in color mailbox next to the driveway with the number "2940" on the front.



## ATTACHMENT B

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1), those violations involving Dzung Ahn PHAM, D.O., and occurring between January 1, 2014, and the present, namely:

a.   United States currency in an amount exceeding $500.

b.   Controlled substances, including but not limited to, oxycodone, hydrocodone, alprazolam, amphetamine salts, carisoprodol, tramadol, and buprenorphine.

c.   Documents that refer or relate to times when controlled substances, including but not limited to, oxycodone, hydrocodone, alprazolam, amphetamine salts, carisoprodol, tramadol, and buprenorphine, were prescribed, customer lists, appointment books, pharmacy information, correspondence, notations, logs, receipts, journals, books, and records.

d.   Medical records, patient files, sign-in sheets, charts, billing information, payment records, and identification documents that refer to any of the following patients: **PHAM's patients, identified by law enforcement agents and investigators, medical board personnel, and/or Dr. Munzing, receiving large quantities and/or combinations of commonly abused and diverted drugs, and/or patients residing at the same address receiving combinations of commonly abused and diverted drugs, and/or patients who have sought prescriptions from PHAM**

**via text message, and/or patients identified in Orange County Sheriff-Coroner's reports:**

| | |
|---|---|
| A.A.; DOB: 10/15/1981 | R.J.; DOB: 11/23/1943 |
| B.A.; DOB: 12/27/1988 | B.A.K.; DOB: 8/21/1988 |
| D.A.; DOB: 7/22/1960 | A.K.; DOB: 8/10/1979 |
| E.A.; DOB: 1/3/1979 | B.K.; DOB: 11/20/1973 |
| E.A.; DOB: 4/11/1974 | T.K.; DOB: 4/19/1986 |
| J.A.; DOB: 1/1/1958 | T.K.J.; DOB: 12/5/1981 |
| C.A.; DOB: 1/4/1965 | A.K.; DOB: 1/26/2009 |
| J.A.; DOB: 5/1/1975 | C.K.; DOB: 3/31/1982 |
| M.B.; DOB: 2/2/1970 | B.K.; DOB: 01/18/1986 |
| M.B.; DOB: 12/29/1977 | D.K.; DOB: 07/26/1975 |
| S.B.; DOB: 1/5/1981 | D.K.; DOB: 12/13/1978 |
| R.B.; DOB: 8/2/1967 | D.L.; DOB: 10/12/1971 |
| T.B.; DOB: 2/27/1979 | E.L.; DOB: 1/15/1973 |
| B.B.; DOB: 9/21/1979 | N.L.; DOB: 7/17/1976 |
| L.B.; DOB: 2/26/1985 | T.L.; DOB: 6/8/1970 |
| M.B.; DOB: 4/22/1982 | D.L.; DOB: 1/9/1989 |
| L.B.; DOB: 1/22/1980 | R.L.; DOB: 9/8/1991 |
| P.B.; DOB: 10/17/1944 | D.L.; DOB: 11/9/1958 |
| A.M.B-C; DOB: 3/11/1989 | J.L.; DOB: 4/27/1989 |
| D.B.; DOB: 5/30/1982 | T.L.; DOB: 10/27/1978 |
| L.B.; DOB: 5/1/1966 | G.M.; DOB: 3/29/1983 |
| M.B.; DOB: 4/30/1979 | J.M.; DOB: 9/17/1983 |
| T.B.; DOB: 6/9/1956 | S.M.; DOB: 4/5/1970 |
| D.B.; DOB: 5/21/1976 | L.M.; DOB: 7/24/1947 |

| | |
|---|---|
| J.B.; DOB: 8/10/1979 | M.M.; DOB: 3/22/1973 |
| M.B.; DOB: 11/30/1984 | K.M.; DOB: 1/29/1979 |
| A.C.I; DOB: 10/16/1993 | J.M.M.; DOB: 12/29/1980 |
| B.R.C.; DOB: 1/28/1982 | S.M.; DOB: 8/18/1970 |
| C.C.; DOB: 8/16/1979 | W.M.; DOB: 01/17/1985 |
| J.M.C.; DOB: 3/23/1976 | E.A.M.; DOB: 9/3/1972 |
| L.C.; DOB: 9/4/1982 | R.M.; DOB: 9/10/1968 |
| Z.C.; DOB: 6/4/1979 | N.M.; DOB: 2/15/1982 |
| K.C.; DOB: 12/15/1981 | M.N.; DOB: 2/22/1989 |
| S.C.; DOB: 10/2/1982 | P.N.; DOB: 05/24/1981 |
| S.C.; DOB: 6/19/1975 | J.N.; DOB: 12/1/1963 |
| J.C.; DOB: 8/22/1966 | A.N.; DOB: 9/12/1981 |
| T.C.; DOB: 5/5/1970 | J.N.; DOB: 12/27/1976 |
| J.L.C.; DOB: 12/24/1980 | S.N.; DOB: 1/4/1963 |
| C.C.; DOB: 7/16/1974 | D.N.; DOB: 06/25/1970 |
| R.A.C.; DOB: 8/20/1987 | R.P.; DOB: 8/5/1956 |
| S.C.; DOB: 9/14/1984 | R.P.; DOB: 9/5/1984 |
| J.D.; DOB: 7/18/1980 | D.P.; DOB: 1/18/1970 |
| W.D.; DOB: 12/24/1977 | R.P.; DOB: 3/9/1982 |
| S.D.; DOB: 9/1/1986 | B.P.; DOB: 6/15/1978 |
| D.R.D.; DOB: 8/6/1975 | L.P.; DOB: 01/10/1962 |
| R.D.; DOB: 5/12/1980 | M.P.; DOB: 11/14/1974 |
| K.D.; DOB: 6/28/1977 | W.P.; DOB: 11/28/1958 |
| C.D.; DOB: 2/19/1984 | C.P.; DOB: 8/12/1992 |
| L.D.; DOB: 5/29/1967 | G.P.; DOB: 1/19/1952 |
| J.D.; DOB: 10/3/1965 | B.P.; DOB: 8/5/1982 |

| | |
|---|---|
| P.D.; DOB: 5/23/1980 | O.G.R.; DOB: 10/14/1981 |
| R.D.; DOB: 1/29/1973 | T.R.; DOB: 1/13/1993 |
| A.E.; DOB: 7/19/1974 | K.R.; DOB: 8/23/1970 |
| J.E.; DOB: 3/21/1971 | B.R.; DOB: 12/25/1982 |
| K.E.; DOB: 7/15/1950 | H.R.; DOB: 5/15/1989 |
| T.E.; DOB: 10/9/1974 | C.R.; DOB: 11/18/1964 |
| A.E.; DOB: 8/30/1983 | R.R.; DOB: 6/25/1984 |
| V.F.; DOB: 7/1/1987 | J.P.S.; DOB: 8/17/1971 |
| M.F.; DOB: 2/15/1989 | S.T.S; DOB: 8/31/1993 |
| S.F.; DOB: 10/2/1975 | M.S.; DOB: 05/13/1971 |
| S.F.; DOB: 12/13/1957 | C.S.; DOB: 4/15/1977 |
| J.F.; DOB: 6/10/1976 | K.S.; DOB: 5/6/1974 |
| K.F.; DOB: 5/7/1983 | N.S.; DOB: 01/18/1952 |
| M.B.F.; DOB: 6/4/1989 | S.S.; DOB: 7/27/1976 |
| M.G.; DOB: 7/1/1971 | R.S.; DOB: 4/30/2988 |
| E.G.; DOB: 4/27/1984 | E.S.; DOB: 07/29/1987 |
| N.G.; DOB: 06/02/1979 | E.S.; DOB: 5/3/1982 |
| P.G.; DOB: 08/07/1982 | J.E.; DOB: 03/20/1985 |
| C.G.; DOB: 03/10/1981 | J.S.; DOB: 12/27/1958 |
| J.G.; DOB: 8/17/1973 | C.S.; DOB: 10/16/1996 |
| K.G.; DOB: 9/19/1980 | S.L.S.; DOB: 3/19/1994 |
| G.G.; DOB: 9/10/1977 | L.T.; DOB: 6/7/1994 |
| J.H.; DOB: 9/22/1974 | S.T.; DOB: 7/21/1998 |
| K.H.; DOB: 10/29/1976 | B.W.T.; DOB: 4/2/1968 |
| S.H.; DOB: 10/09/1969 | J.T.; DOB: 3/16/1991 |
| S.H.; DOB: 8/26/1974 | E.V.; DOB: 4/2/1983 |

| | |
|---|---|
| J.H.; DOB: 11/9/1975 | R.V.; DOB: 1/4/1980 |
| C.H.; DOB: 3/16/1983 | S.C.V.; 9/15/1966 |
| N.H.; DOB: 5/18/1993 | J.V.; DOB: 6/27/1979 |
| C.H.; DOB: 2/18/1986 | G.V.; DOB: 12/5/1977 |
| A.H.; DOB: 10/8/1972 | E.V.; DOB: 1/7/1985 |
| T.H.; DOB: 10/16/1980 | K.W.; DOB: 12/23/1974 |
| H.A.J.; DOB: 3/24/1965 | E.W.; DOB: 4/5/1989 |
| M.J.; DOB: 5/12/1963 | D.W.; DOB: 2/29/1952 |
| J.J.; DOB: 4/19/1987 | J.W.; DOB: 9/5/1979 |
| J.J.; DOB: 9/22/1970 | W.Z.; DOB: 8/20/1979 |

e.    Personal telephone and address books and listings, letters, cables, telegrams, emails, personal notes, and other items that refer or relate to the prescription of any controlled substance.

f.    Financial records showing payment, receipt, concealment, transfer, or movement of money relating to the prescription of any controlled substance.

g.    Documents, including but not limited to emails, check registers, cancelled checks, deposit items, financial instruments, facsimile transmissions, or ledgers that refer to any person to whom PHAM prescribed a controlled substance.

h.    Memoranda concerning, correspondence with, and/or letters to or from any insurance company that refer to any person to whom PHAM prescribed a controlled substance.

i.    Financial instruments purchased with currency in

x

the sum of $500 or more.

        j.   Precious metals valued at $500 or more.

        k.   Records, documents, titles, mortgage paperwork, and deeds reflecting the purchase, rental, or lease of any real estate and vehicles, such as a car, truck, motorcycle, boat, plane, or RV.

        l.   Not more than twenty (20) indicia of occupancy, residency, rental, or ownership of the **SUBJECT PREMISES**, identified in attachments A-1 through A-5, including but not limited to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, and escrow documents.

        m.   Keys to show ownership of storage facilities, businesses, locked containers, cabinets, safes, conveyances, and/or other residences.

        n.   As used herein, the terms amphetamine salts, alprazolam, oxycodone, hydrocodone, and buprenorphine include all medications containing the drug, including those marketed under brand names.

        o.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Target Offense, and forensic copies thereof.

    2.   With respect to any digital devices used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the device;

g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h. records of or information about Internet Protocol addresses used by the device;

i. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

4.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; peripheral input/output devices, such
as keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices,
such as modems, routers, cables, and connections; storage media,
such as hard disk drives, floppy disks, memory cards, optical
disks, and magnetic tapes used to store digital data (excluding
analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

86.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or

seize and transport the device(s) to an appropriate law
enforcement laboratory or similar facility to be searched at
that location. The search team shall complete the search as
soon as is practicable but not to exceed 120 days from the date
of execution of the warrant. The government will not search the
digital device(s) beyond this 120-day period without first
obtaining an extension of time order from the Court.

      b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

      i.    The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized. The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

      ii.    The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

      iii.    The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

      c.    If the search team, while searching a digital
device, encounters immediately apparent contraband or other

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

      g.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized

by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

       h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

87.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

       a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

       b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

       c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

       d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

       e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

xvi

   f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

   g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

88. During the execution of this search warrant, law enforcement is permitted to: (1) depress PHAM's and/or GARCIA's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of PHAM's and/or GARCIA's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

89. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## ATTACHMENT C

The following procedures will be followed in order to minimize disruption to the legitimate medical needs of patients:

A patient whose medical information has been seized pursuant to this search warrant may request that a copy of that seized information be returned to the patient.  These requests must be in writing and shall be submitted to Special Agent Lindsey Bellomy, Drug Enforcement Administration, 1900 East First Street, Santa Ana, California 92705.  Requests may also be faxed to (714) 647-4969 or emailed to Lindsey.M.Bellomy@usdoj.gov.  The government must provide to the patient making the request a copy of any medical information it has regarding the patient within 48 hours (excluding weekends and holidays) of receiving the request.